**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

-against-

HEBERT VELOZA-GARCIA,

              *Defendant.*

07-Cr-274 (WHP)

---

## SENTENCING MEMORANDUM, PSI NOTATIONS, AND REQUEST FOR VARIANCE OR DOWNWARD DEPARTURE ON BEHALF OF HEBERT VELOZA GARCIA

        **ROJAS & OLIVA, P.A.**
        **Ruben Oliva, Esq.**
        **Attorneys for the Defendant**
        **Fountain Square**
        **15800 Pines Boulevard**
        **Suite 206**
        **Pembroke Pines, Florida 33027**

Of Counsel:
Ruben Oliva, Esq.

TABLE OF CONTENTS

Preface .......................................................................................................................4

I.   The Guidelines: Objections to the Advisory Sentencing
     Guideline computation.......................................................................6

     a.   Objections............................................................................6
     b.   Proposed modifications.........................................................7
     c.   Clarifications to the offense conduct section.......................7

II.  Departures and Variances: The Defendant merits sentencing
     leniency (whether labeled variance or departure) as a
     consequence of extraordinary acceptance of responsibility
     and rehabilitation, family circumstances and other matters...............7

     a.   Introduction...........................................................................7
     b.   The Defendant's extraordinary acceptance of responsibility..................8
     c.   Family circumstances and collateral consequences of his misconduct......10
     d.   The combination of factors including the Defendant's timely confession,
          timely plea, family circumstances and collateral consequences,
          assistance to the efficient administration of justice,
          considered together warrant a departure or variance from the
          advisory guidelines.............................................................14

III. Analysis of Section 3553(a) sentencing factors...........................................16

     a.   Section 3553(a)(1): the nature and circumstances of the
          Offense and the history and characteristics of
          The defendant.......................................................................16

          1.   The Offense
          2.   History and characteristics of the Defendant

     b.   Section 3553(a)(2): the need for the sentence imposed to reflect
          the seriousness of the offense, to promote respect for the law,
          and to provide just punishment for the offense……............................21

     c.   Section 3553(a)(2)(C): the need for general deterrence and
          the need to "protect the public from further crimes of the
          defendant"...........................................................................22

     d.   Section 3553(a)(6): the need to avoid unwarranted sentencing
          disparities among defendants with similar records who have
          been found guilty of similar conduct....................................24

     e.   Section 3553(a)(2)(D): the need to provide the defendant with
          needed educational or vocational training, medical care,
          or other correctional treatment in the most effective manner........................27

IV.   SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT........................................................28

    a.       Substance of the cooperation rendered..........................................................28
    b.       Analysis of U.S.S.C. § 5K1.1.............................................................................39

V.    CONCLUSION: THE MINIMALLY SUFFICIENT SENTENCE.........................................41

The defendant, **HEBERT VELOZA GARCIA** (hereinafter referred to as Hebert or Veloza), respectfully registers his proposed objections and clarifications to the Pre-Sentence Investigation Report (PSR), requests consideration of a variance or downward departure based in part on his extraordinary acceptance of responsibility and rehabilitation and further mitigation of his sentence as a result of his truly extraordinary substantial assistance. Mr. Veloza will humbly ask that this Honorable Court impose a non-guideline alternative sentence that is "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. § 3553(a).  This memorandum is provided to assist the Court in arriving at a just and appropriate sentence. Beyond its contents, Mr. Veloza looks forward to the opportunity to set forth additional information at the sentencing hearing.  As the Memorandum discusses in detail, we believe that based upon all of the facts and circumstances in the case a sentence of the time already served in custody, one hundred and nine (109) months is fair, reasonable and just.[1]

**Preface**

This case may be considered somewhat different than most.

On March 5, 2009 Hebert Veloza came to the United States for the first time in his life. Some years earlier, in 2004, he had voluntarily demobilized from a paramilitary organization, the *Autodefensas Unidas de Colombia* (hereinafter AUC), that he had joined back in the late nineties when he was still in his twenties and had eventually risen to the rank of commander.  After some stops and starts he eventually joined the Justice and Peace Law[2] process becoming it's most successful and exemplary participant and continuing a course of cooperation that continues to this day. In early 2007, he met, along with his attorney, with American prosecutors and agents

---

[1]      Veloza was formally arraigned in the Southern District of New York on March 5th, 2009. However, he was indicted on April 23rd, 2007 and was held in custody in Colombia pending extradition since that date.  Accordingly he should receive jail credit from that date.

[2]      The Justice and Peace Law is a legal framework enacted into law by the Government of Colombia that allows for the prosecution and sentencing of members of illegal armed groups that had demobilized. Attached as Exhibit 1 is an article describing this law in more detail.

and waived his Miranda rights and provided hours and hours of information which formed most of the basis for his own indictment several weeks later. That voluntary confession and cooperation with the Governments of Colombia and the United States in early 2007 has continued unabated until today.

Hebert comes before the Court in 2016 a far different person than when he was involved in criminal activity years before. The Court in *Pepper v. United States*, 131 S. Ct. 1229 (2011), addressed the importance of considering events that transpire between the criminal conduct and the sentencing in the punishment decision. Hebert Veloza comes before the Court as a contrite and remorseful individual who has demonstrated by deeds and not just words that he is truly repentant and prepared to pay for his misdeeds and ready to return to society as a rehabilitated, productive and law-abiding citizen.

After years of mandatory sentencing guidelines, the Supreme Court has restored the traditional power of federal district court judges to impose individualized sentences that are not greater than necessary to satisfy the statutory purposes of sentencing. The federal district court can now consider all of the characteristics of the offender, the circumstances of the offense and reject advisory guidelines. This memorandum details Section 3553 factors, describes the background of Hebert, the offense conduct, and other facts, including cooperation. This document is sealed because of continuing investigations and prosecutions, as well as continuing jeopardy to Hebert and his family and others if these facts are publicly revealed.

There are few, if any, more tangible symbols of rehabilitation, repentance, and acceptance of responsibility than (1) voluntary confession of guilt prior to indictment, (2) a whole hearted plea before the Court, (3) repeated assistance to law enforcement agents over several years in investigations and prosecutions and (4) his voluntary participation and assistance as part of the Justice and Peace process in his native country. Amongst others, these are sentencing facts.

Pursuant to *U.S. V. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted a three-step approach. (See Fed. R. Crim. P. 11(M), amended December 1st, 2007 and Amendment 741 of the Sentencing Guidelines, effective November 1st, 2010) First, the court is to resolve any disputed guideline issues and determine the *advisory* guideline range. Second, the Court is to consider if there any factors that may warrant a departure from the advisory guideline range. As before *U.S. v. Booker*, the court is to depart when it is warranted under the facts and circumstances of a particular case. "The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered." *U.S. v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005). See also, *U.S. v. McBride*, 434 F.3d 470 (6th Cir. 2006) (holding that guideline departures are still a relevant consideration for determining the appropriate guideline sentence). Third, the Court should determine whether a variance, a sentence outside the advisory guideline system, is warranted under the authority of 18 U.S.C. § 3553(a) in order to impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in the statute. Lastly, the Court should grant the Government's anticipated request for departure of the sentencing guidelines and further mitigate the defendant's sentence as a result of his significant and substantial assistance to the Government. Consistent with the required procedure, the Defendant will address (I) the advisory guidelines, (II) the departures and variances that might apply, (III) the statutory sentencing factors, (IV) the defendant's substantial assistance, (V) a review of the 5K1.1. factors and, finally, suggest punishment.

## I.   THE GUIDELINES: OBJECTIONS TO THE ADVISORY SENTENCING GUIDELINE COMPUTATION

### a.   Objections

Paragraphs 32. and 33. provide for two separate enhancements pursuant to U.S.S.G. §2D1.1(b)(2) and §2D1.1(b)(15)(C). However, neither of these enhancements were in effect at

the time of the commission of the criminal conduct charged in the indictment. Accordingly, pursuant to U.S.S.G. §1B1.11, the Court must apply the Guidelines Manual in effect on the dates that the offense of conviction was committed. If the Court were to grant the Defendant's objections then paragraph 41. would be amended and the total offense level would be changed to level 41 which provides for a guideline range of 324 to 405 months.

### b. Proposed modifications

The Defendant does not have any proposed modifications.

### c. Clarifications to the offense conduct section.

The offense conduct section of the PSR is correct and is, in fact, largely based on the Defendants own statements to the Government (both prior to and subsequent to his indictment). One important clarification needs to be made.  This Defendant has been charged with narcotics trafficking in the United States and in this regard the offense conduct set forth in the PSR which is directly related to that conduct should certainly be considered by the Court.  However, the Defendant has also been charged in his native country of Colombia with the activity directly related to his role as a member of the AUC and this criminal conduct has been fully addressed as part of the Justice and Peace Law process discussed in more detail below.  Accordingly, the Defendant would respectfully suggest that this Court should consider that this Defendant has been prosecuted and punished for his activities as an AUC commander and its associated criminal conduct.

II.   **DEPARTURES AND VARIANCES: THE DEFENDANT MERITS SENTENCING LENIENCY (WHETHER LABELED VARIANCE OR DEPARTURE) AS A CONSEQUENCE OF EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY AND REHABILITATION, FAMILY CIRCUMSTANCES AND OTHER MATTERS**

### a. Introduction

As this Court is aware, district courts are now free from the mandatory nature of the Federal Sentencing Guidelines, *U.S. v. Booker*, 543 U.S. 220 (2005).  Subsequent to *Booker*, *Gall v.*

*United States*, 128 S. Ct. 586, and *Kimbrough v. United States*, 128 S. Ct. 558, both decided on December 10, 2007, and *U.S. v. McBride*, 511 F. 3D 1293 (11th Cir. 2007), made clear that district courts are only required to give "some weight" to the advisory guidelines, as they are to the other 18 USC § 3553 factors, and any attempt to give special weight to the sentencing guidelines is contrary to *Booker*. However, the Supreme Court has since gone further in its recent decision in *Nelson v. United States*, 129 S. Ct. 890 (2009), where the court reiterated what it said in *Rita v. United States*, 551 U.S. 338 (2007), that a sentencing court may not presume that a sentence within the applicable guideline range is reasonable but added "the Guidelines are not only not mandatory on sentencing courts, they are also not to be presumed reasonable." To that end, Mr. Veloza offers the following:

**b. The Defendant's extraordinary acceptance of responsibility and rehabilitation.**

As noted in the preface above the circumstances surrounding this defendant's acceptance of responsibility and rehabilitation are truly unusual and extraordinary. As a young man Veloza had been drawn into an organization whose ideology and purposes he believed and shared. As he rose through the ranks of the organization his starry eyed ideology gave way to hard realities, ambition, and greed. In 2004, when the time came for him to demobilize and turn in his weapons and have his men stand down he jumped at the opportunity. But what he had first thought was an earnest and genuine effort to finally come to terms with his organization's failures and crimes soon turned into more lies and evasions. After demobilizing he returned to the countryside in order to begin a coca plant eradication program that provided employment, and indeed redemption, for his men who had laid down their arms and could now be paid to eradicate the very coca leaves that had poisoned and undermined the organization. However, this effort was short-lived as leaders of the organization were not quite ready to truly halt their activities. Disillusioned, he briefly returned to the fold and made a fitful and brief attempt to return to his

old ways. But underlining his true desire to end his involvement, he resumed his efforts to genuinely confess and cooperate regarding his criminal activity. Upon his arrest by the Colombian authorities he immediately announced his intention to truly participate in the Justice and Peace process and he is now viewed as the single solitary AUC commander who truly and wholeheartedly has participated in the process by not only confessing his own participation in criminal activity but more importantly serving as an able and willing witness against many of his fellow paramilitary commanders, the drug traffickers who incorporated themselves into the organization, and the politicians and military and police officers who aided and abetted and indeed benefited from the AUC. That participation in the process has involved thousands of hours of testimony, which has resulted in the arrest and conviction of a myriad of individuals.[3]

More importantly, shortly after being arrested by the Colombian authorities he was approached by the United States government and he readily agreed to meet with them. Over the course of several days Mr. Veloza, with the assistance of his own counsel, executed written Miranda waivers[4] and went on to provide a full throated confession to all of his crimes against not only the government of Colombia but the government of the United States as well. It was this very information that comprised the basis for his indictment in the Southern District of New York a few weeks later. That desire to voluntarily cooperate has continued to this day.

Hebert's voluntary cooperation pre-indictment and pre-arrest is not properly reflected in either the sentencing guidelines or in the context of the Government's motion for reduction of sentence pursuant to U.S.S.G. §5K1.1. Counsel would submit that under U.S.S.G. § 5K2.0(a)(4) this Honorable Court may and should grant a downward departure based on the Defendant's extraordinary acceptance of responsibility. *See*, *U.S. v. Rogers*, 972 F.2d 489 (2d Cir. 1992)

---

[3]     Attached hereto as Exhibit 2 are the certificates from the several prosecutor's offices who are prosecuting Veloza reflecting the number of days in which he has appeared either personally (while in Colombia) or via video conference (while in the United States).
[4]     Attached hereto as Exhibit 3 are the executed Miranda waivers.

(defendant who exhibits a higher degree of contrition than contemplated by § 3E1.1. may, in an appropriate case, receive a downward departure).

Counsel is also advised of the following anecdotal information concerning other judges that have provided downward departures or variances based upon "super acceptance of responsibility." Judge Hebert Dimitrouleas of the United States District Court for the Southern District of Florida granted a two-year downward departure for voluntary surrender in the case styled *U.S. v. Jose Willer Moreno Escobar a/k/a Mono Willer*, Case No. 12-CR-20796-WPD, DE 1.

In another case the Honorable Judge Federico Moreno, the Chief Judge for the Southern District of Florida, granted a two level downward variance without any government opposition to two Spanish women who voluntarily surrendered to the Southern District of Florida. *See U.S. v. Martinez Ramos & Veloza Manso*, Case No. 06-CR-20791, DE 575 (Martinez Ramos' voluntary surrender in November 2009 and JNC entered 3/18/2010) and DE 632 (Veloza Manso's voluntary surrender in November 2010 and JNC entered 1/31/2011). These two women fought extradition in Spain for a number of years before reaching the decision to "voluntarily" travel to the United States to face charges.

Most recently the Honorable Judge Roberto Scola, also of the United States District Court for the Southern District of Florida, granted a thirty (30%) percent variance from the advisory guideline sentence solely based on the Defendant's voluntary surrender (which was post-indictment). *United States v. Nelson Galindo Godoy*, Case No. 12-Cr-20637-RNS (SDFL).

c. **Family Circumstances and Collateral Consequences of his Misconduct**

**Risk of Danger to family as a result of his cooperation:**

It is widely known in Colombia that Hebert has cooperated with the Government. As a result, his family is in grave danger from individuals who wish to either silence Hebert or simply want to punish the family members of cooperators in general. It was this that formed the basis for the granting of witness protection for his first wife in Colombia and the paroling into the United

States of his second wife. In addition, his own mother was threatened in Colombia, which required her to file a complaint with the local police station.[5]

This is not speculation; there have been any number of murders of cooperators and/or their family members in the past in Colombia. Several articles from Colombian newspapers reporting on the killing of former government witnesses who returned to their country are attached as Exhibit 5.

Cooperation with federal authorities entails psychological tolls that constitute punishment. The Third Circuit has recognized that being revealed as a cooperator with the federal agents risks subjecting him to "possible criticism, public harassment, social ostracism, or even physical injury." *Lame v. United States Dep't of Justice*, 654 F.2d 917, 926 (3d Cir. 1981). The Second Circuit has held that "[m]any view a cooperating witness as a betrayer or informer; unquestionably, such a person is not generally held in high regard. But the fairness of our system of criminal justice may best be seen in its treatment of those individuals held in low esteem." *United States v. Ming He*, 94 F.3d 782, 785 (2d Cir. 1996). Furthermore, the "prison code . . . requires inmates to be antagonistic to any inmate who cooperates with the Government in criminal prosecutions." *United States v. Vaulin*, 132 F.3d 898 (3d. Cir. 1997).

The extent and significant impact of his surrender to the Government cannot be underestimated and certainly are not properly considered by the guidelines. In the criminal circles in Colombia a person who voluntarily surrenders and cooperates with the Government is seen in a much harsher light than someone who is arrested and much later is "forced" to cooperate. As such the Court should consider the horrible consequences of Hebert's voluntary surrender for his family.

---

[5]    Attached hereto as Exhibit 4 is the declaration or complaint filed by his mother with the authorities.

**Sole source of support for his family:** Beyond the danger to himself and his family is the fact that Hebert is the sole source of support, both financial and emotional, for his immediate family as well as for his children who depend on him for their survival.  Colombia, for all of its development in recent years, still does not have a safety net for its poorest citizens.

Hebert's family circumstances may warrant sentencing leniency.  See *U.S. v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (affirming a downward departure where defendant was sole support for her children); *U.S. v. Califano*, 978 F.2d 65 (2d Cir. 1992) (remanding for reconsideration in light of *Johnson*); *U.S. v. Leon*, 341 F.3d 928 (9th Cir. 2003) (affirming the district court's departure based on defendant's indispensable role in caring for his wife).

Hebert currently supports his ex-wife and minor children and some of his siblings.

**Longer jail term than ordered:** Hebert may serve a longer jail term than ordered by the Court as a consequence of the collateral consequences of separate DHS deportation proceedings, which will only commence once he is transferred from the BOP to ICE custody.[6]  Moreover, the conditions of confinement at the ICE deportation facility are poor.  See *U.S. v. Ortiz*, 2007 WL 4208802 (D.N.J.) (The court varied from the Guidelines based on the horrible prison conditions where the defendant was being held.  The court had previously heard testimony regarding the conditions of the prison and granted a variance.)

Finally, if Hebert is deported to his home nation, he may well be murdered shortly thereafter in retaliation for his cooperation.  Likewise, his family, from his elderly mother, to his youngest son, must live with the fear of retribution.

**Bureau of Prisons Visiting Issues Unique to Hebert Veloza**: The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the

---

[6]  *U.S. v. Smith,* 27 F.3d 649 (D.C. Cir. 1994), recognizes the departure factors that, (1) because of his status as an "extraditable", (2) because he is ineligible for community release as otherwise statutorily mandated under 18 U.S.C. §§ 3621(b) and 3624(c), and (3) because he will essentially serve more time than required under the jail sentence and will have to go through ICE deportation proceedings, these factors may warrant a variance or departure.  The Defendant concurs.

inmate and to develop closer relationships between the inmate and family members or others in the community" (see BOP p.s. 5267.07). However, Mr. Veloza is a removable alien and upon being sentenced, he will not be designated to a minimum-security camp, and he might very well be designated to a BOP privately contracted facility without easy access from major cities. None of these facilities currently operate in New York, for example. Mr. Veloza' mother and his siblings all live in Colombia.  Visits from any family member will be very difficult, and few and far between.

**Hebert Veloza' Incarceration as an Inmate and Removable Alien:** As already stated, Hebert Veloza voluntarily came to the United States several years ago and surrendered himself. He immediately accepted responsibility for his involvement in this offense, he immediately began to cooperate, and he pled guilty. Mr. Veloza understands that in addition to any further term of incarceration he may receive, he will not receive certain benefits during his incarceration, and he may be held by immigration authorities beyond any sentence imposed by this Court, and then, certainly, he will be removed from the United States because of his conviction and alien status in the United States. Again, his immigration status will preclude him from being designated to a minimum-security facility.

Mr. Veloza is also aware his immigration status will not allow him to benefit from an early release to a community corrections facility (see 18 USC § 3624)[7] Rather he will be subject to additional immigration detention beyond any sentence imposed in this case until he is eventually removed from the United States to his native Colombia.   Again, Mr. Veloza was aware of all this when he made the decision to come to the United States and voluntarily surrendered himself.

---

[7] *U.S. v. Navarro-Diaz*, 420 F. 3d 581 (6th Cir.  2005), *U.S. v Davoudi*, 172 F. 3d 1130 (9th Cir.  1999), *U.S. v. Charry Cubillos*, 91 F. 3d 1344 (9th Cir.  1996, *U.S. v. Farouil*, 124 F. 3d 838 (7th Cir.  1997), affirming district court's discretion to consider this issue for a downward departure; and U.S. v. Pacheco-Soto, 386 F. Supp. 2d 1198, 1205 (D.N.M. 2005), *U.S. v. Bakeas*, 987 F. Supp.  44 (D. Mass. 1997), *U.S. v. Smith*, 27 F. 3d 649 (D.C.Cir. 1994), in which the district court did depart downward citing alien not entitled to minimum security camp and/or early release to community corrections center.

> ### d. The combination of factors including the Defendant's timely confession and cooperation, timely plea, family circumstances and collateral consequences, assistance to the efficient administration of justice, considered together warrant a departure or variance from the advisory guidelines.

Throughout this memorandum, the Defendant will respectfully invite this Honorable Court to consider issues of departure and variance.   In doing so, we respectfully invite consideration of the following thought,

> Although departure authority is not a device for subverting the Guidelines, *see Bonnet-Grullon,* 212 F.3d at 709, its restrained use in limited circumstances can provide appropriate flexibility in an elaborate sentencing regime that, however thoughtfully constructed, could not possibly anticipate all of the circumstances that might arise in its application.

*U.S. v. Lauersen*, 362 F.3d 160, 168 (2d Cir. 2004).

There is a body of Circuit case law, preceding the Supreme Court's pronouncements in *Rita, Booker* and *Koon* and thereafter suggesting this Court may separately, under the guideline regime, and certainly now by variance, reward, (1) this Defendant's overall cooperation in Colombia and in the United States, (2) his timely voluntary confession and plea, (3) his assistance in testifying against politicians, prosecutors and military officers in Colombia, and his overall assistance to the administration of justice. [8]

Hebert's decision has had a spiral and positive effect in this district.  His plea and cooperation, (1) saved time of limited judicial resources, (2) saved time of limited prosecutorial

---

[8]  *U.S. v. Brown*, 985 F.2d 478, 482-83 (9th Cir. 1993) (under § 5K2.0, in light of defendant's confession, court can depart downward from the range if it determines that the two point reduction did not adequately reflect acceptance); *U.S. v. Miller*, 991 F.2d 552 (9th Cir. 1993) (voluntary restitution exhibiting extraordinary acceptance of responsibility can justify downward departure); *U.S. v. Farrier*, 948 F.2d 1125, 1127 (9th Cir. 1991) (*U.S. v. Gee*, 226 F.3d 885 (7th Cir. 2000) (affirms 2-level downward departure for acceptance of responsibility under § 5K2.0, where Defendant was not eligible for adjustment for acceptance under § 3E1.1 because went to trial.)  *U.S. v. Faulks*, 143 F.3d 133 (3d Cir. 1998); *U.S. v. DeMonte*, 25 F.3d 343, 349 (6th Cir. 1994) (in computer fraud case, departure proper on ground that defendant admitted to crimes about which government had no knowledge, even though part of plea bargain to cooperate-remanded); *U.S. v. Lieberman*, 971 F.2d 989, 995-96 (3d Cir. 1992) (downward departure where Defendant offered to make restitution greater that amount taken, met with bankers and offered to explain how avoided detection, resigned his position and went to FBI to admit his embezzlement, pled guilty); *U.S. v Crumb*, 902 F.2d 1337, 1339-40 (8th Cir. 1990) (voluntary surrender nine days after issuance of warrant 9 month downward departure).

resources, and (3) procured the voluntary plea of others. Independent of the traditional reward for cooperation, those results may also merit variance consideration.

In *U.S. v. Veloza*, 926 F.2d 125 (2d Cir. 1991), the court ruled that even in the absence of a government-sponsored USSG § 5K1.1 motion, the district court can depart downward where a defendant's plea induced others to likewise plead guilty thereby clearing a busy trial court's calendar.

> Having found that mitigating circumstances such as those in Veloza's case have not been adequately considered by the Sentencing Guidelines, we must then determine if they are a permissible basis for departure from the Sentencing Guidelines. ***We conclude that the additional assistance rendered the court in the disposition of the charges against the other defendants justified the departure from the Sentencing Guidelines. As Judge Daly found, Veloza's conduct "broke the log jam" in a multi-defendant case. ....This conserved judicial resources by facilitating the disposition of the case without a trial.***
>
> In cases such as this, the district court has "sensible flexibility" to depart in circumstances where departure from the Sentencing Guidelines has a reasonable basis. *See U.S. v. Lara,* 905 F.2d at 603 (citing *U.S. v. Palta,* 880 F.2d 636, 639 (2d Cir.1989); *U.S. v. Correa-Vargas,* 860 F.2d 35, 40 (2d Cir.1988)).

*Veloza*, 926 F.2d at 128.  See also, *U.S. v. Carrozza*, 807 F. Supp. 156 (D. Mass. 1992) (same), *aff'd*, 4 F.3d 70 (1st Cir. 1993).  *Carrozza* notes,

> As the Court of Appeals for the Second Circuit has recognized, the Sentencing Guidelines do not address the value of the contribution made by a defendant whose plea of guilty also leads to the disposition of all charges against his co-defendants, resulting in the resolution of a substantial case "pending in the seriously over clogged dockets of the Courts of the United States." *U.S. v. Veloza,* 926 F.2d 125, 127-28 (2d Cir. 1991); *see also, U.S. v. Agu,* 949 F.2d 63, 67 (2d Cir. 1991) ("Cooperation with the judicial system can, in appropriate circumstances, warrant a departure"). ...

*Carrozza*, 807 F. Supp. at 159; *U.S. v. Shah*, 263 F. Supp. 2d 10, 37 (D.D.C. 2003) ("Because the Guidelines do not forbid consideration of facilitation of justice as a departure factor, a defendant's timely plea "and his actions ancillary thereto may have ameliorative consequences so far beyond ordinary expectations as to warrant a downward departure for conserving judicial resources and thereby facilitating the administration of justice.").

III.   **ANALYSIS OF SECTION 3553(A) SENTENCING FACTORS**

The Defendant's analysis follows.

   a. **Section 3553(a)(1):** *the nature and circumstances of the offense and the history and characteristics of the defendant.*

      1.   **The Offense**

With respect to the nature of the offense, Defendant recognizes that by his actions he promoted the commission of a crime. Hebert was engaged in a conspiracy to distribute narcotics with knowledge that it would be unlawfully imported into the United along with the criminal activities associated with the organization he belonged to and which he readily admitted to. Such conduct is harmful to society and deserves punishment. Mr. Veloza succumbed to the lure of easy money, which, as it turned out, only proved the old adage – there is no free lunch. Mr. Veloza's involvement with the drug trade has cost him his family, his savings and his liberty.

      2.   **History and characteristics of the Defendant**

Hebert's early life is marked by poverty and the struggle to survive in low-paying jobs fraught with danger and despair. He was among the youngest of ten children of a car mechanic and a housewife. When he was in sixth grade he had to drop out to help his father in his trade. As a young man he had struggled since the age of 15 to make a living in the only jobs that were available to an uneducated and poor man in an area of Colombia that was economically devastated by decades of civil strife – working in coca fields where he was bitten by an insect that caused him to suffer from a flesh eating bacteria for months, a bus driver at 16, a cab driver at 17. Eventually, he moved back to his birthplace and began working as a truck driver. As with all of the truck drivers in Uraba there are only two types of loads that they could transport -- bananas and contraband. In both cases there were taxes that needed to be paid to the communist guerrillas who essentially controlled this region of Colombia. The truck drivers were poorly paid and yet would often face the unfair and arbitrary taxing of their meager payments and the expropriation

of their trucks by the communist guerrillas. And so it happened that at the age of 27, several years after being able to scrounge and save and be able to buy his own truck, that the guerrillas seized his truck claiming that the owner of the cargo had not paid the taxes due. Showing the daring and fearlessness that would later mark his career in the AUC he went back in the darkness of night and stole his truck back from the guerrillas by himself. However, he knew he could no longer drive his truck to the zone without risk of being killed or worse. He traveled to the eastern plains of Colombia to transport rice.

It was at this time that by the twists and turns of life he was recruited to join the nascent AUC, a paramilitary organization that had slowly grown in response to the scourge of the communist guerrillas throughout the countryside. He was only 27 when he was taken to a farm, provided a uniform, handed a rifle, and trained to be the equivalent of a private in the paramilitary organization. Thereafter, he was sent back to the very same region where he had been victimized by the guerrillas and was given the opportunity to instead fight against them but now with men in uniform and with the full backing and support of the Colombian military. Thereafter began his military career where he was recognized for his success in fighting against the communist guerrillas and steadily promoted eventually achieving the rank of commander and in command of two AUC Blocs.

For years, the FARC[9] had financed itself through its participation in drug trafficking including the taxing of the production and transportation of cocaine. On the other hand, the AUC had originally been financed by the farmers and ranchers who were most affected by the control

---

[9]     *Fuerzas Armadas Revolucionarias de Colombia* (Revolutionary Armed Forces of Colombia) "is a guerrilla movement involved in the continuing Colombian armed conflict since 1964. It has been known to employ a variety of military tactics in addition to more unconventional methods, including terrorism. The FARC claim to be an army of peasant Marxist–Leninists with a political platform of agrarianism and anti-imperialism. The operations of the FARC are funded by kidnap and ransom; illegal mining; extortion and/or taxation of various forms of economic activity; and the taxation, production, and distribution of illegal drugs. The FARC has been involved in mass kidnappings of civilians, mass killings, forced recruitment of young men, kidnapping of young girls (as young as 13) to serve as sex slaves, sexual abuse and forced abortions, and indiscriminate violence against the population. Source: Wikipedia - https://en.wikipedia.org/wiki/FARC

and dominance of the guerrillas. However, seeking a new source of funding, the leaders of the AUC decided to take a page from the FARC playbook and they themselves decided to start taxing the drug traffickers.

The leaders of the AUC tapped Veloza to lead this effort to collect taxes and in the same way that he had been able to rise through the ranks and to survive because of his cunning and fearlessness, Hebert soon proved adept at finding the way to effectively and efficiently collect drug taxes from the drug traffickers. His success at finding a means to collect taxes from drug traffickers eventually proved his undoing and the undoing of the entire organization. As millions and millions of dollars in tax revenue flooded the AUC they quickly abandoned their original purpose in fighting the guerrillas and it soon became their sole purpose to expand their zones of control not only in zones where the guerrillas had run rampant but also into zones where there was no guerrilla presence at all. Soon the lines between the paramilitary and the drug trafficking organizations became blurred until they became one and the same. The people and the Government of Colombia who had long supported, overtly and implicitly, the paramilitary organizations soon realized that they had in fact become a criminal organization dedicated to undermining the government and society at large.

The Colombian government then began an offensive against their former partners and provided a framework by which they could put down their arms and be held accountable for their crimes. This process enacted as the Justice and Peace Law, which was in some ways was similar to the same process that had been used in other countries such as South Africa, entailed the demobilization of the armed groups, and the cooperation and confession by its members in exchange for reduced sentences for their criminal activity.

It was in this way that Hebert Veloza eventually became one of the ablest and most effective participants in the process. His assistance to the governments of Colombia and the United States will be further detailed below.

The letters from his family members are all consistent in that he is extremely remorseful for his crimes and is, in fact, a wonderful family man dedicated to their well being.  It is his dedication to his family that has motivated him to come forward, to make amends, and to accept the punishment that will surely be meted out but with the hope of someday soon returning to his family. The letters from his family along with the translations are attached hereto and incorporated herein as Exhibit X.

His former mother-in-law, ████████████ writes about the fact that Hebert is a great father to his step-daughter ██████ and that he is a generous man having donated groceries and medicines to the homes of for the elderly located in Medellin and Cisneros as is was an adoption center, ████████████████, where she is a volunteer.  His ex-wife, ████████████ ██████ echoes her mother's statements by also noting what a great father he has been, always being supportive, and also noting his generosity in providing groceries for the poor, wheelchairs for the elderly, and milk and diapers for the babies at the adoption center. His stepdaughter, ████████████████, states that since the moment that he met her he has been very special with her and has always been very attentive. She notes that he is in constant contact with her, making sure that she is doing well in school and not hang around bad company. He always reminds her not to take the wrong path and to make sure that she studies and becomes a professional. Finally, she notes that he is extremely remorseful for his actions. His niece, ██████ ████████████████, recognizes that he has made errors in his life but believes that he will be able to make amends due to his remorse and his desire to be reunited with his family. His sister, ████████████████, writes about the struggles that he had as a young man and how he worked very hard to support himself and his family. She recalls the time when he was a bus driver and was so dedicated to his job. She concludes her letter by noting that he should pay for his errors but recognizing that he has been very remorseful and he has asked for forgiveness and attempted to make amends with his victims.  His other former mother-in-law, ████████████,

also notes that he has been very responsible towards his children and grandchildren. His niece, ███████████████, who has been a public defender and now is working towards being a constitutional law professor and eventually a magistrate, writes with great respect and admiration for her uncle who has continued to encourage her in her career and been attentive to what is happening in her professional and personal life. His brother, ███████████████, notes that he was never in agreement with his brother's activities but recognizes his remorsefulness and his disposition to cooperate with law enforcement and humbly asks for clemency for his brother. His sister, ███████████, writes that they have shared many letters and phone calls during his term of imprisonment and that she has observed his repentance, and the fact that he has learned a hard lesson and is now conscious of the impact that he had in his community for which he is now making amends through both his cooperation and the efforts that he has had in the past to give back to his community.

Finally, ███████████████, who only met Hebert during the process of demobilization, noted with approval his actions which demonstrated his remorse to society "by showing a great disposition to make amends to the community" by, among other things, funding renovations of many homes and the building of aqueducts and rural roads; the funding of educational and vocational programs for single mothers; handing out Christmas gifts for the children of the poor; funding the purchase of land for peasant families and making sure that his men could properly reintegrate themselves into society.

This is a defendant whose life circumstances inexorably led him to become enmeshed in drug trafficking. While this is no excuse it does explain his eventual desire, once he had a path, to extricate himself from this life and to pay his debts to society if nothing more so that his family could flourish and he could return to them a truly free man. It is to the defendant's credit that years later he realized what a horrible and terrible mistake he had made and decided to come forward and confront his misdeeds.

Like his children, the Defendant's siblings and elderly father, longingly await his return. All of them express the great love for him and the admiration and respect that the Defendant has earned in taking the decision to make amends.

     b.    **Section 3553(a)(2): *the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense***

Long ago, prior to considering ameliorative punishment for cooperators, Congress suggested that the largest drug dealers should face a 10-year mandatory minimum sentence. Congress, reflecting the community sense, felt that 10 years imprisonment adequately reflects both the seriousness of such crimes and would promote respect for the law. There is no evidence they considered distinguishing such sentences for Colombian nationals and citizen violators. This may be an appropriate sentencing starting point in this case.

Recently, the Commission suggested that many of its past sentencing practices were far too severe and suggested amendments to the drug guidelines which have been subsequently promulgated. *See, n. 1, supra.*

Prior to the 2014 changes, the Commission's 2011 Report to Congress on Mandatory Minimum sentencing provisions provide the following useful summary:

> Floor statements delivered by members in support of the 1986 Act and a committee report on a predecessor bill suggest that Congress intended to create a two-tiered penalty structure for discrete categories of drug traffickers. Specifically, Congress intended to link the five-year mandatory minimum penalties to what some called "serious" traffickers and the ten-year mandatory minimum penalties to "major traffickers."...

> Senator Robert Byrd, then the Senate Minority Leader, summarized the intent behind the legislation:

> ***For the kingpins—the masterminds who are really running these operations … we require a jail term upon conviction. If it is their first conviction, the minimum term is ten years…. Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail—a minimum of 5 years for the first offense.***

21

U.S. Sentencing Commission, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 24 (2011) ["Mandatory Minimum Report"] (quoting 132 Cong. Rec. 27, 193–94 (Sept. 30, 1986); H. *Diaz* R. Rep. No. 99–845, pt. 1, at 11–12 (1986)). Cited with more detailed explanation in, 2013 WL 322243 at *4.

The general problem is that Congress never intended the severe penalties of today but the Commission tied enhancements and adjustments to a far too high starting point.  *U.S. v. Diaz,* 2013 WL 322243, *4 (E.D.N.Y.).

Consequently, a starting point in the 10 year range, before considering variance issues, before considering cooperation, meets the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

In addition, the prescribed guideline sentence for the offense does not take into consideration factors previously argued, such as the Defendant's extraordinary acceptance of responsibility, his significant assistance to the Government, the collateral consequences of his actions, and his extraordinary rehabilitation evident here.

To promote respect for the law the punishment in this case should be less than prescribed by the sentencing guidelines.  A sentence that includes some limited incarceration followed by supervised release would reflect the seriousness of the offense, promote respect for the law and provide just punishment as well as deterrence.

> c.  **Section 3553(a)(2)(C):** *the need for general deterrence* **and** *the need "to protect the public from further crimes of the defendant"*

Law enforcement did not approach this Defendant to arrest him.  To the contrary, Hebert, from Colombia, through counsel, approached United States law enforcement.  These events, from 2007, continuing through his surrender and cooperation for the next years, speak loudly and directly to the issue of specific deterrence.

Hebert may be deported as soon as he completes his jail term.  In more tangible terms, (1) his surrender, (2) his cooperation directed against those with whom he conspired, (3) his public notoriety concerning the information he provided against others, and (4) the threats rained on him and his family, given the foregoing — all militate against any need to further protect society from this Defendant, beyond a minimum sentence.

This Defendant knows he faces the functional equivalent of life imprisonment for this offense (now and if he reoffends) and recognizes the extraordinary reach of U.S. justice.  There is a negligible risk he will re-offend.

He is a pariah to his former associates, including those who are violent.  He has separated himself from his former criminal associates in a tangible way.

No matter what jail sentence this Court chooses to impose, there will be future punishment. Hebert will live with the anxiety and worry of retribution. As a cooperator and witness for law enforcement for a period of years, Hebert undertook the risk that he would be murdered by former confederates for what he did and for how he was doing it.

He is deterred from crime.

Society is protected from further crimes on the part of this Defendant.

General deterrence is likewise served (beyond whether the sentence is a few years more harsh or more lenient) because it is known to others that this Defendant, and those similarly situated, will be charged, extradited, and held thousands of miles from home, family, and friends in a place that is, for the most part, inaccessible to loved ones.  This is an extreme penalty beyond what is measured in months and years.

The research finding is that "deterrence works."  It works in the sense that there is less crime with a criminal justice system than without one.  The question for the Court is also "marginal deterrence," *i.e.*, whether any particular additional quantum of punishment would result in increased deterrence and thus decreased crime.  Here, the findings are uniformly

negative: there is no evidence that increases in sentence length reduces crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."[10]

### d.   Section 3553(a)(6): *the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct*

Also, particularly relevant here for Mr. Veloza is the fact that the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "Before *Booker*, the then-mandatory Sentencing Guidelines effectively foreclosed any consideration of this sentencing factor unless the Guidelines had not 'adequately' taken the circumstances into consideration." *United States v. Doe*, 412 F. Supp. 2d 87, 91 (D.D.C. 2006)

"Now that the Guidelines are advisory, however, judges are free—and perhaps required—to take account of sentence disparities when devising a punishment for a particular offender." *Id.* (emphasis added), *see also Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ("Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities—along with other § 3553(a) factors—when imposing sentences.")

While all cases are different and all defendants within a case are different, this principle of non-disparate sentencing is an important one and we believe that it should be invoked.

---

[10]   That 2010 paper relies upon an extraordinary number of studies of recidivism by, (1) the U.S. Department of Justice, (2) other well respected journals, (3) the Center for Economic and Policy Research, as well as, (4) conclusions reached by Steve Aos, Marna Miller, and Elizabeth Drake, "Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates," Olympia: Washington State Institute for Public Policy, 2006.  See also, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).  See also, *Deterrence in Criminal Justice-Evaluating Certainty vs. Severity of Punishment*, November 2010, The Sentencing Project.

> Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing a longer prison terms.  In fact, research findings imply that increasingly lengthy prison terms are counterproductive.  Overall, the evidence indicates that the deterrent effect of lengthy prison sentences would not be substantially diminished if punishments were reduced from their current levels.

For whatever its value, some analogous dispositions are described below.

**Similarly situated members of the *AUC*:**

  **1.   *United States v Carlos Mario Aguilar a/k/a Rogelio;*  Case No. 08 Cr. 528 (LAP)**

Carlos Mario Aguilar was the head of the notorious *Oficina de Envigado*, which was a part of the AUC but was largely dedicated to the collection of drug debts, murder for hire and drug trafficking and extortion.  Mr. Aguilar provided substantial assistance against many of the same defendants as Mr. Veloza.  However, while both men were involved in violent activities, Aguilar's violence was directed at civilians including United States government confidential informants and their families. The main distinction between Mr. Aguilar and Mr. Veloza is that the former was the leader of an organized crime organization tied to the AUC while the latter was the commander of an AUC Bloc that battled the guerrillas while collecting drug taxes.  Mr. Aguilar was sentenced in May 6th, 2015 to a sentence of **time served (approximately seven years)**.

  **2.   *United States v Mauricio Lopez a/k/a Yiyo; Case* No. xx**

Mauricio Lopez was the successor head of the notorious *Oficina de Envigado* after the surrender of Mr. Aguilar. Mr. Lopez also provided substantial assistance against many of the same defendants as Mr. Veloza.  As with Mr. Aguilar, the main distinction between Mr. Lopez and Mr. Veloza is that the former was the leader of an organized crime organization tied to the AUC while the latter was the commander of an AUC block that battled the guerrillas while collecting drug taxes.  Mr. Lopez was sentenced in December of 2015 to a sentence of **eight (8) years.**

  **3.   *United States v. Gustavo Alvarez-Tellez;* Case No. 11-Cr-369 (EDNY)**

Mr. Alvarez-Tellez was the right hand man for a successor head of the *Oficina de Envigado*, Maximiliano Bonilla a/k/a *Valenciano*.  Mr. Alvarez-Tellez was involved in the importation of tons of cocaine into the United States through Mexico and elsewhere.  Mr.

Alvarez-Tellez was captured in Curacao and began his cooperation upon his arrival to the United States.  He was sentenced to **three years**.

### 4. *United States v Juan Carlos Sierra-Ramirez a/k/a El Tuso; Case* No. 02-Cr-388 (DC Cir.)

This individual was a significant cocaine transporter and a full-fledged member of the A.U.C. who was captured in Colombia and extradited.  In his stipulated statement of facts he was described as the organizer of large transportation operations for AUC members that involved worldwide shipment of cocaine by aircraft, freighters and speedboats.  Sierra admitted that he organized the transportation of cocaine by airplane from Colombia to Central America and Mexico as well as maritime exportations from Colombia to Honduras and Mexico.  He was sentenced to time served after serving **five years**.

### 5. *United States v. Dagoberto Perez, Case No. xx-Cr-xx (SDNY, District of Columbia)*

Dagoberto Perez was a long time, large-scale drug trafficker who exported tons of cocaine from Colombia to the United States.  He also paid tribute to the *Oficina* and was associated with the AUC.   He was indicted in both the Southern District of New York and the District of Columbia and eventually his cases where consolidated in Manhattan.  Of note, among the charges he pled to was obstruction of justice related to his hiring a corrupt SIU officer, Mr. Roque Veloza Pedrozo, through the *Oficina*.  He voluntarily surrendered and cooperated and received a sentence of **five years**.

### 6. *United States v. Nicolas Bergonzoli; Case No. 99-Cr-196 (SDFL)*

Mr. Bergonzoli was involved in both exporting cocaine as well as being linked to the AUC. He was sentenced to **27 months** on January 21st, 2004.

**7.** *United States v. Hector Restrepo;* **Case No. 10-Cr-135 (EDNY)**

Mr. Restrepo was involved in the transport and export of large quantities of cocaine and like Hebert herein was also linked to the AUC. This defendant voluntarily surrendered and cooperated. He received a sentence of **five years**.

**8.** *United States v. Jhon Jairo Rendon-Herrera a/k/a Yesid;* **Case No. 04-cr-962 (SDNY)**

This individual was one of the commanders of the AUC as well as significantly involved in drug trafficking. On May 10, 2011 he was sentenced to time served after having been incarcerated for approximately **two years**.

**9.** *United States v. Carlos Fernando Serralde;* **Case No. 03-1188 (SDNY)**

This defendant was a commander in the AUC as well as being responsible for distributing tons of cocaine. He was extradited from Colombia in November of 2011 and in July of 2012 he was sentenced to **56 months**.

**10. Additional relevant sentences.**

At sentencing, the Defendant will describe the disposition of other large-scale Colombian violators who voluntarily surrendered in other districts, their comparative culpability, cooperation, and the 2013-4 sentences imposed. Those sentences are in the 54-60 month range.

e.   **Section 3553(a)(2)(D):** *the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

A number of courts utilize the provisions of this section to focus on the rehabilitative ideal inherent in the punishment process. *Pepper v. United States*, 131 S. Ct. 1229, 1242-1243 (U.S.), focuses on this criteria. This Defendant is extremely remorseful for his misconduct. Everything Hebert has accomplished since offering his cooperation speaks well of his rehabilitation potential. This Defendant, (1) has a hopeful future awaiting him with good family, (2)

acknowledges his guilt, and (3) and expressed remorse in multiple tangible fashions, including cooperating from the United States and South America, a serious undertaking. While the Court has the duty to consider the need for "treatment," additional prison time is not necessary to promote rehabilitation. Rehabilitation has already occurred.

IV. **SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT.**[11]

The government has filed a sentencing memorandum incorporating a 5K1.1. motion on behalf of Hebert due to his extraordinary substantial assistance. This motion, coupled with the philosophy espoused in *Booker* and its progeny, free the Court to sentence Mr. Veloza to whatever sentence the Court deems reasonable, completely unrestrained by the Guidelines nor any minimum mandatory sentence.

    a.   **Substance of the cooperation rendered**:

        1.  *Assistance to the Government of Colombia.*

As noted in the Government's sentencing memorandum this Defendant has provided extensive substantial assistance to the Government of Colombia through the Justice and Peace process by which he was held accountable for the criminal activity related to his role as commander of an AUC Bloc which encompassed much of the activity that's described in the government's 5K submission. As noted above this assistance and participation in the Justice and Peace process culminated in a sentence by the Colombian government of forty years suspended to seven years. An article describing the importance of his sentence is attached hereto as Exhibit 7. Despite the fact that he's already been sentenced in this process, Mr. Veloza continues to provide assistance and testimony to this very day. Since much of the activity addressed in the

---

[11] This sentencing issue is also guided by *United States v. Barner*, 572 F.3d 1239, 1250 (11th Cir. 2009), where the court held, "after *Booker*, a judge basing a sentence under the considerations outlined in 18 U.S.C. § 3553 may take a defendant's substantial assistance into account even if a prosecutor withdraws (or does not file) a § 5K1.1 motion." Consistent with Circuit law, although separate areas of cooperation rendered by the Defendant may never rise to the level of a government sponsored U.S.S.G. § 5K1.1, this Court may choose to provide a benefit consistent with its statutory authority. The Court may decide on its own whether those efforts should be recognized.

government's submission is related to his activities related the AUC it is only proper that his

assistance to the Colombian government also be addressed as well:

i. **Senator Ramon Antonio Valencia Duque**: As a result of testimony rendered by the defendant on March 26, 2008, on June 9, 2008 on July 14, 2008, and finally a November 6 of 2008; this former senator of the republic was charged with conspiracy to promote illegal armed groups and as a result of his plea was sentenced to 45 months of imprisonment.



ii. **Senator Ruben Dario Quintero Villada**: Dario Quintero was a senator, leader of a major political party and candidate for the presidency. As a result of testimony rendered by the defendant on March 26th, 2008 and again in June 9th, 2008 this individual was eventually sentenced to 90 months in jail for conspiracy to promote illegal armed groups.



iii. **Senator Humberto de Jesus Builes Correa**: As a result of the testimony provided by Mr. Veloza this former senator was eventually sentenced to 90 months in jail as a result of being charged with conspiracy to promote an illegal armed group.



iv. **Representative Manuel Dario Avila Peralta**: This congressman was sentenced by the Supreme Court of Colombia to 55 months of imprisonment as a result of the testimony rendered by the defendant in regards to his involvement with the AUC.



v. **Representative Jesus Enrique Doval Urango**: This congressman was sentenced by the Supreme Court of Colombia to 55 months of imprisonment as a result of the testimony rendered by the defendant in regards to his involvement with the AUC.



vi. **Representative Cesar Augusto Andrade Moreno**: This congressman was sentenced by the Supreme Court of Colombia to 55 months of imprisonment as a result of the testimony rendered by the defendant in regards to his involvement with the AUC.



vii. **Representative Estanislao Ortiz Lara**: This congressman was sentenced by the Supreme Court of Colombia to 100 months of imprisonment as a result of the testimony rendered by the defendant in regards to his involvement with the AUC.



viii. **Senator Juan Carlos Martinez Sinisterra**: As a result of testimony rendered by the defendant on March 26, June 9, and July

11 of 2008 this former Colombian senator was charged with conspiracy to promote illegal armed groups in Colombia. Veloza subsequently testified before the Colombian Supreme Court on February 7 of 2011, which led to the conviction of this individual and his subsequent sentence of 90 months.

ix.    **Governor Juan Jose Chaux Mosquera:** As a result of testimony provided by Mr. Veloza this former governor of the state of Cauca was charged with promoting (aiding and abetting) illegal armed groups. He spent 841 days in custody and has since been released on bond while awaiting his trial.

x.    **Governor Oscar de Jesus Lopez Cadavid:** This former governor has been charged with aiding and abetting an illegal armed group as a result of testimony provided by the defendant. Veloza subsequently testified at his trial and despite testimony being rendered by other AUC commanders in contradiction to the testimony of Mr. Veloza the court found the governor guilty and specifically stated that they believed Mr. Veloza's testimony over that of other AUC commanders.

xi.    **Luis Fernando Zea Medina and Hector Duque Echeverry:** The defendant testified on February 11th, 2006 and again on August 18th, 2008 and September 24th, 2008 in regards to an agro-industrial project involving palm oil in the state of Choco which was actually owned by one of the founders of the AUC, Vicente Castaño, using these businessmen as front men and straw owners. As part of this government sponsored agricultural project the AUC  engaged in a pattern of homicides, forced displacement, and the illegal seizure of property under the color of law. In the sentence convicting these wealthy businessmen of those crimes the court specifically noted with approval the testimony of Mr. Veloza and stated as follows: "It is important to note that Hebert Veloza, has provided a confession of the criminal acts perpetrated by his organization in the Choco zone according to [the Justice and Peace laws] which provides for voluntary testimony by the applicants to that process, and which is the only opportunity that they have to confess in a complete and truthful manner their involvement in this illegal armed group and the crimes committed during and as a result of their membership in same. Testimony which we believe is worthy of all credibility based on our critical observation because it is coherent, provided with clear knowledge

of the matter, veracity, and an aptitude forthcoming from a person who notwithstanding his criminal history, related his activities as a commander of the bloc in Colima of the AUC, demonstrated an evident desire to state to the authorities the truth about his criminal activities within the illegal organization; information which turned out to be valuable to both this and other judicial investigations. Moreover, no fraudulent manipulation, lies or distortions can be discerned in his testimony since the demobilized limits himself to state in a detailed manner his experiences within this group on the margins of the law, with these businessmen operating in Jiguamiando and Curvarado." An article commenting on the sentencing of the palm growers is attached hereto as Exhibit 8.

xii. **Gabriel Jaime Sierramoreno, Mario León Villa Pacheco, Juan José Palacios, Manuel Gregorio Denis Blandón, Mario Alberto Vélez Giraldo, Sor Enid Ospina Rendón, Javier José Daza, Katia Patricia Sánchez Mejía, Hernán Iñigo De Jesús Gómez Hernández, Sor Teresa Gómez Álvarez, Gabriel Segundo Fernández Navarro, Orlando Moreno Mora, Remberto Manuel Álvarez Vertel, Dagoberto Antonio Montiel Mercado, Robín Manuel Galongue, Raúl Alberto Penagos González, José Miguel Ruiz Cossio and Claudio Adolfo Fregni Ochoa:** All of these individuals were also sentenced as a result of their participation and involvement in the agro-industrial project in the state of Choco.

xiii. **General Rito Alejo del Rio Rojas:** On March 11th, 2009 the Supreme Court of Colombia overturned a decision of the Attorney General of the Republic of Colombia that this Army General had not conspired to aid and abet the AUC while he was the commanding officer of the brigade which was responsible for the zones in which the defendant operated, citing a large part the testimony of the defendant as a basis of its decision. As a result of that decision this general is now being prosecuted for his activities in promoting the activities of the defendant, an AUC commander in the same zone. An article about this general is attached hereto as Exhibit 9.

xiv. **Col. Byron Gabriel Carvajal Osorio:** This Army colonel was convicted at trial of being the leader, as a colonel in the Colombian army, of the assassination of seven anti-narcotics police officers that he attempted to justify as friendly fire, which occurred in 2006. Mr. Veloza's testimony was crucial in that he established that dating back to 1995, when the coronel was an Army captain, that they engaged in joint patrols against the

FARC and other guerillas in Uraba and that as such he engaged in several false positives, which involved the assassination of civilians or the execution of guerillas and sympathizers and which were made to appear as having died in combat. His testimony was vital in allowing the prosecution to prove that this Army colonel had a long-standing relationship with illegal groups, which lent credence to the prosecutor's theory that the coronel had perpetrated this massacre of police officers at the behest of a local narcotics drug trafficking organization.

xv.  **Jose Alberto Quintero Munoz:** This individual was arrested on September 24, 2008, several days after having been identified by Mr. Veloza as the main liaison between Vicente Castaño and drug trafficking organizations in Medellin. He was subsequently convicted in 2010 and sentenced to 7 ½ years of incarceration.

xvi. **Guillermo Valencia Cossio:** On March 2, 2009, Mr. Veloza again testified on behalf of the government and before the Supreme Court of Justice against this former sectional director of the National Prosecutor's Office in Medellin, who was charged with  being connected to the criminal organization headed by Daniel Rendon Herrera a/k/a *Don Mario* and in so doing hiding from the authorities the involvement of John Fredy Manco Torres a/k/a *El Indio*, the presumed second-in-command of this criminal organization. As part of his testimony Mr. Veloza testified as to his participation in the AUC along with both individuals when they were all members of the AUC. On March 9, 2011 the Supreme Court of justice sentenced this individual to 15 years of prison based in part on the Veloza's testimony.

*2.* ███████████████████████

██████████████████████████████████████

██████████████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████

██  ████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████  ████████

---

[12] The Organized Crime Drug Enforcement Task Force is a federal drug enforcement program in the United States, overseen by the Attorney General and the Department of Justice. OCDETF is the centerpiece of the Attorney General's drug supply reduction strategy. In order to enhance the OCDETF Program's ability to contribute to the President's mandate to reduce the drug supply, the Program focuses its resources on coordinated, nationwide investigations, targeting the entire infrastructure of major drug trafficking. It also assisted in the development of the Attorney General's Consolidated Priority Organization Target (CPOT) List, a unified agency target list of international "command and control" drug traffickers and money launderers. OCDETF's attack on the related components of these major trafficking organizations will not only disrupt the drug market, resulting in a reduction in the drug supply, but will also bolster law enforcement efforts in the fight against those terrorist groups supported by the drug trade.





**6.**





███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

Hebert's assistance is not merely limited to providing information about individuals under investigation or pending trial.  He was also extensively debriefed regarding any number of individuals about whom he had information and intelligence although he had not dealt directly with them such that he could procure an indictment or be a witness against them.  While this information and assistance does not have the tangible results as noted above it did provide critical and vital intelligence that has been widely used by the United States law enforcement community.  The intelligence, information, insights, and methods of operation as to both his organization as well as other narcotics trafficking and money-laundering organizations has propagated throughout the agency and has been of incalculable assistance not only to the Southern District of New York but to many other districts who have targeted individuals throughout Colombia.

It is abundantly clear that Hebert's information has been useful and significant and that the overwhelming extent of his assistance has served to deal severe blows to major drug

trafficking organizations as well as the violent and corrupt organizations that exist to both serve and prey upon them.  From current and former drug traffickers, to corrupt police officials, to major cartel leaders no one has been spared from Hebert's complete, honest, full and incredibly risky assistance to the Government.

   **b.    Analysis of U.S.S.G. § 5K1.1 factors**

The guideline provides a detailed focus for analysis.  The applicable guideline notes,

(1)  The court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered.

(2)  The truthfulness, completeness, and reliability of any information or testimony provided by the defendant.

(3)  The nature and extent of the defendant's assistance.

(4)  Any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance.

(5)  The timeliness of the defendant's assistance.

With regard to the first criteria, there is little doubt that the Defendant's cooperation was of extraordinary import to the government as it applies to the prosecutions of his former associates as well as of others.

Defendant expects the Office of the United States Attorney for the Southern District of New York will speak in laudatory terms.  Certainly, the law enforcement agents, with whom this Defendant has worked, have expressed themselves in that manner.

With regard to the second criteria, there is no question that officials have been able to rely upon Hebert's word that is reflective of his honesty, personal integrity, and reliability.  Hebert asked counsel to emphasize to the Court that from the inception of his agreement to cooperate, it was his intention, while either free or jailed in the United States, to live up to his part of the bargain.  He has been truthful.  He has been complete.  He has been reliable.

The nature and extent of Hebert's assistance are sufficiently outlined in this memorandum.

The fourth criterion is particularly important.  The Court is asked to consider "injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance."  The fact remains that Colombia is a violent country.  Drug dealers are murdered every day by their rivals.  They are murdered by their former friends and associates for business reasons and for personal reasons.  The most prominent reason for murdering a drug associate is because of fear he will cooperate with law enforcement or the fact he has cooperated.  There are countless murders of Colombian drug dealers every week.  The full import of this Defendant's risk of danger will be explained at the sentencing hearing.

Finally, the Court is asked to consider the "timeliness of the Defendant's assistance."  As noted, Hebert offered his cooperation to the government in 2007. Based upon circumstances, Hebert's cooperation with the S.D.N.Y. has dovetailed with other ongoing and important criminal investigation commenced by the Drug Enforcement Administration both here as well as in other districts and countries.  Veloza was able to timely provide historical information that has yielded and will continue to yield valuable information that will lead to other seizures, indictments and arrests.

Hebert well acquits himself with regard to the distinct five criteria that serve as points of analysis under Section 5K1.1.

By its very nature, there is no way this memorandum can be fully comprehensive.  There is no way for counsel to fully understand the investigatory significance of each interview and the manner in which federal law enforcement agents in the S.D.N.Y, E.D.N.Y., S.D.F.L, N.D.D.S, Bogota, and elsewhere utilized and benefited from Hebert's cooperation.

### V.    Conclusion: The minimally sufficient sentence

Hebert appreciates the opportunity provided by law enforcement to engage in an extensive cooperative effort over the past six years.  He is repentant about his past and prayerful about his future.

The parsimony provision found in 18 U.S.C. §3553(a) imposes a statutory cap on sentences, no matter what is recommended under the sentencing guidelines: the district court is required to impose the least severe sentence necessary to satisfy the four purposes of sentencing enumerated in the statute.  Hebert and his family appreciate the Court's consideration.

WHEREFORE, the Defendant respectfully files this sentencing memorandum.

Respectfully submitted,

**ROJAS & OLIVA, P.A.**
**Attorneys for the Defendant**
**Fountain Square**
**15800 Pines Boulevard**
**Suite 206**
**Pembroke Pines, Florida 33027**
**(305) 373-6868**
**ruben@rojasoliva.com**

By:_____
RUBEN OLIVA, ESQ.
F.B.N. 626074

### CERTIFICATE OF LIMITED SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via email this May 23, 2016, to:  Andrea Surrat, A.U.S.A.

By:_____
RUBEN OLIVA, ESQ.

41