G67LGARS                         Sentence

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          07 CR 274 (WHP)

 5   HERBERT VELOZA GARCIA,

 6             Defendant.

 7   ------------------------------x

 8                                   New York, N.Y.
                                     June 7, 2016
 9                                   2:35 p.m.

10
     Before:
11
                   HON. WILLIAM H. PAULEY III,
12
                                          District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ANDREA SURRATT
17        Assistant United States Attorney

18   RUBEN OLIVA
          Attorney for Defendant
19
     ALSO PRESENT:  SELMA MARKS, Spanish Interpreter
20                  FRANCISCO OLIVERO, Spanish Interpreter

21

22

23

24

25
```

1              (Case called)

2              MS. SURRATT:  Good afternoon, your Honor.  Andrea

3     Surratt for the government.  With me at counsel table with the

4     Court's permission is intern Caroline Zielinski.

5              THE COURT:  Good afternoon, Ms. Surratt.

6              MR. OLIVA:  Sorry, your Honor.  We're having some

7     technical difficulties.

8              THE DEPUTY CLERK:  Counsel for the defendant.

9              MR. OLIVA:  Good afternoon, your Honor.  Ruben Oliva

10    on behalf of defendant Herbert Veloza Garcia, who is present,

11    and prepared to proceed with the aid of the interpreter.

12             THE COURT:  Good afternoon to you, Mr. Oliva.

13             I note the presence of a Spanish interpreter.  Would

14    you identify yourself for the record.

15             THE INTERPRETER:  Selma Marks, M-A-R-K-S.

16             THE COURT:  All right.  And are you certified?

17             THE INTERPRETER:  Yes, I am, your Honor.

18             THE COURT:  Very well.  Good afternoon.

19             THE INTERPRETER:  Good afternoon.

20             THE COURT:  Mr. Veloza Garcia, are you able to

21    understand what's being said here this afternoon through the

22    Spanish interpreter?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  Good afternoon.  This matter is on for

25    sentencing.  Are the parties ready to proceed?

1          MS. SURRATT:  Yes, your Honor.

2          MR. OLIVA:  Yes, your Honor.

3          THE COURT:  Mr. Oliva, have you reviewed with your

4     client the presentence investigation report?

5          MR. OLIVA:  I have, your Honor, at length.

6          THE COURT:  Are there any factual matters set forth in

7     the report that you believe warrant modification or correction?

8          MR. OLIVA:  No, your Honor.

9          THE COURT:  And the matter that you raised in your

10    submission with respect to the calculation of the guidelines by

11    probation, has that been corrected to your satisfaction?

12         MR. OLIVA:  It was.  My objection was upheld by

13    probation, but they instead used a different calculation which

14    I have no problem with.

15         THE COURT:  Very well.

16         Ms. Surratt, are there any factual matters set forth

17    in the report that the government believes warrant modification

18    or correction?

19         MS. SURRATT:  No, your Honor.

20         THE COURT:  Does the government have any application

21    here?

22         MS. SURRATT:  Your Honor, the government today moves

23    under Section 5K1.1.

24         THE COURT:  All right.  Mr. Oliva, before I hear from

25    you, I pose a question I guess in the first instance to

1    Ms. Surratt.  I've reviewed the government's 5K letter on

2    behalf of the defendant and I ask, quite frankly, why is the

3    Court being asked to sentence the defendant today?

4             MS. SURRATT:  Your Honor, I think that the answer is

5    that this defendant has been in custody for a long time and a

6    lot of the defendants against whom his cooperation is still

7    pending are uncertain in terms of their pending arrival to the

8    United States.

9             So as the Court has certainly noticed, there are

10   defendants who are, for instance, pending extradition from

11   Colombia against whom this defendant's cooperation may still be

12   needed; but some of the timing on that is uncertain.  And

13   together with Mr. Oliva, the government decided that there was

14   no sense in delaying his sentencing indefinitely since he has

15   been in U.S. custody for -- it's over a hundred months at this

16   point.

17            THE COURT:  All right.  I just note that you write to

18   me that a principal defendant against whom the defendant is

19   cooperating, Mr. Rendon Herrera, is expected to be extradited

20   from Colombia and to arrive in the U.S. "in the near term."

21   And you then state that Mr. Veloza Garcia is a crucial witness

22   against Rendon Herrera.

23            Why, if Rendon Herrera is about to be extradited to

24   the United States and may go to trial, why would the government

25   come in and say now is the time to sentence the cooperator?

1          MS. SURRATT:  Yes, your Honor.  I think Mr. Rendon

2    Herrera's arrival in the U.S. has been expected in the near

3    term for quite some time.  It is what we have been told from

4    the Colombian government.  But as the Court knows, extradition

5    proceedings are by their nature somewhat uncertain.  And we

6    think that with the supervised release conditions that we've

7    asked for, which are detailed in page 22 of the 5K, that that

8    takes care of any concerns about continued cooperation.  And

9    Mr. Oliva has assured the government that his client is

10   extremely willing to continue his cooperation beyond his

11   sentencing in this case.

12         THE COURT:  All right.  So am I to assume from the

13   government's presentation of Mr. Veloza Garcia for sentencing

14   at this time that the government thinks that he's been

15   incarcerated long enough?

16         MS. SURRATT:  Your Honor, the government obviously is

17   not going to make a sentencing recommendation for this

18   cooperator beyond laying out, as is laid out in detail in the

19   5K, that this is an extraordinary defendant in really all

20   senses of the word -- extraordinary in terms of his very

21   serious criminal conduct, but also extraordinary in terms of

22   his cooperation.  In terms of whether or not he's been in jail

23   for long enough, that's obviously for the Court to decide.

24         I will say that whether he receives additional time in

25   jail or whether he is released and is serving a term of

1     supervised release, the government is confident that he will

2     appear to cooperate if he is needed, even if he is serving a

3     sentence in a BOP facility somewhere other than New York.  So

4     that's the calculation the government made, your Honor, is that

5     basically no matter what happens here, he can still be a

6     valuable government cooperator.

7            THE COURT:  What about the defendant's concern that

8     he's going to be turned over to ICE?

9            MS. SURRATT:  Yes, that is going to happen, your

10    Honor.  So to the extent the Court sentences the defendant to

11    time served today -- again, the government takes no position on

12    that -- or if he serves another few years in jail, at the end

13    of this prison sentence, he will be remanded into ICE custody.

14           I understand from Mr. Oliva that Mr. Oliva intends to

15    make a Convention against Torture application on behalf of his

16    client.  So, ultimately, Mr. Oliva's hope is that his client

17    will be released into the United States and not be sent back to

18    Colombia.

19           THE COURT:  All right.  Thank you, Ms. Surratt.

20           Mr. Oliva, do you wish to be heard on behalf of your

21    client?

22           MR. OLIVA:  Yes, your Honor, I do.

23           Your Honor, I do believe that a sentence of time

24    served is appropriate in this case and let me tell the Court

25    why; and, in part, as I tell you that, I think I will address

1    some of the questions that you have.

2         Let me first start by addressing Daniel Rendon

3    Herrera, alias a/k/a Don Mario.  We've been hearing that he's

4    going to be coming here in the short term for the last five

5    years, literally, and that's part of the problem.  He is a

6    major guy in Colombia and he, through any number of means, has

7    been able to avoid his extradition.  And so I think that's part

8    of the reason why at some point it's just unfair to this

9    defendant, particularly in light of everything else that he's

10   done and in light of the sentences that are being received and

11   have been done and to very, very similarly situated defendants,

12   even in this very same courthouse, and that also addresses the

13   secondary question.

14        The language that we have in our submissions in

15   regards to the conditions of supervised release are the

16   identical language that was also applied to two other

17   defendants that I mentioned to you and the similarly situated

18   defendants.  And specifically that would have been Carlos Mario

19   Aguilar, alias Rogelio or a/k/a Rogelio, and Mauricio Lopez,

20   a/k/a Yiyo, both of whom were sentenced in this building and

21   both of them were sentenced to -- one was time served,

22   approximately eight years.  The other one was sentenced to also

23   eight years, so he's doing about seven and a half.

24        Both of those defendants are and were members of the

25   AUC, associated with the paramilitary.  The only difference

1    with them is that they have much more serious charges than this

2    defendant.  They had the murders of a number of government

3    informants, U.S. government informants, which they confessed

4    to, I might add.  And, in addition, those defendants, as

5    opposed to this individual, were really involved much more

6    heavily in the purest form of narcotics trafficking and also

7    murder for hire, kidnapping, drug collections, that kind of

8    stuff.  So really looking at them, neither of those individuals

9    also were participating in the Justice and Peace process, which

10   I'm going to get to in just a second.

11        Both of those defendants are also witnesses against

12   Mr. Rendon Herrera.  And I might add, there are any number of

13   witnesses again Mr. Rendon Herrera.  It's not that the entire

14   case relies on Mr. Veloza Garcia, while certainly Mr. Veloza

15   Garcia would be an important witness and perhaps even crucial.

16   But both of those defendants applied for the Convention against

17   Torture -- one of them is a client of mine -- and both of them

18   have been granted.  Their families have already received

19   political asylum in large part for cooperation that was in some

20   sense similar to one of the defendants that I alluded to here

21   in the United States as to this defendant.

22        However, this defendant has also, as you may recall

23   from reviewing my submission, testified against a far greater

24   number of political and military and police figures in

25   Colombia.

1            THE COURT:  Is that process continuing?

2            MR. OLIVA:  Thank you for asking.  I was about to go

3       there.

4            In fact, if I may, in court is Fernando Villota, who

5       is the Colombian attorney for my client who represents him in

6       the Justice and Peace process.  He just was here with the

7       Colombian prosecutors in the continuation of a process that he

8       has.  They've already spoken with the Colombian government, who

9       fully expects that he will remain here, and allow him to

10      continue cooperating and dealing with that process,

11      particularly in light of some recent developments.

12           And that's something I wanted to address, sort of

13      getting back to my presentation, is that it's very important

14      that this Court understands -- and I think it does -- that

15      almost all of the conduct, a lot of the very bad conduct that

16      you saw in both of our submissions, is conduct that is being

17      prosecuted by the Colombian authorities.  And Mr. Veloza Garcia

18      is one of the few who has actually participated in a full

19      manner and continues to be a participant in that process and

20      will continue being a participant in that process.

21           He has a 40-year sentence, which is suspended to eight

22      years because of his cooperation and his participation.  And

23      cooperation is part of it, but it's not all of it.  It's

24      everything.  It's patterned somewhat after the Commission for

25      Reconciliation that they had in South Africa.  Now that process

G67LGARS                          Sentence

```
 1    is now also again being emulated to deal with the guerrillas

 2    who are in the process, as you may know from reading the news,

 3    they're in Cuba and they're in the final stages of reaching an

 4    agreement, which in large part is using the process that

 5    allowed these individuals to demobilize as a blueprint, with

 6    the very large exception that the Colombian government has

 7    assured those guerrilla commanders they will never be

 8    extradited to the United States to face narcotics charges,

 9    unlike this defendant who, as the Court might recall again,

10    provided the very information that allowed the government to

11    prosecute him and to indict him, actually, in a post-Miranda

12    statement that he made early on.

13            Now, in terms of the Justice and Peace process, that

14    process, despite the fact he's already been sentenced on one of

15    the blocks, there's two other blocks and he continues to

16    participate actively and ably in that process.  And that

17    process is going to continue for a while, for a long while, in

18    fact, because it is a very slow moving, unlike our system,

19    which I think because of our great fortune in terms of

20    having -- I was explaining to Ms. Surratt, nothing is

21    digitized.  There is no electronic case filing.  There is no

22    emails.  They don't even mail each other the documents.

23    They're all deposited in a central location and you have to

24    send your law clerk on a weekly basis just to find out what has

25    happened in the case.  So because of that, it is a very slow
```

G67LGARS                          Sentence

1    moving process.

2          And it's been one of the criticisms of the process,

3    particularly for this defendant because he has literally

4    testified and appeared in video conferences for thousands of

5    hours -- and I think I attached those exhibits -- something

6    that really would be unheard of.  You may have defendants that

7    have appeared before you in an application much like the

8    government has provided in this case and the fact that they may

9    have sat for three or four trial days as a government witness

10   is incredibly notable.  This defendant has been in weeks' worth

11   of trial days testifying on behalf of the Colombian government,

12   against many of the individuals that participated in the

13   paramilitary organization and enterprise.

14         And along those lines, I've given you the low end in

15   terms of what some of these other defendants that were

16   similarly situated have received both in this district and in

17   other districts, such as D.C. and Miami.  Southern District of

18   New York really took the lead in prosecuting AUC commanders,

19   but certainly they weren't the only district.  The District of

20   Columbia has also been very active.

21         And in that regard I wanted to also alert or note to

22   the Court of a similar case, although not really similarly

23   situated.  The highest ranking member of the AUC that's ever

24   been sentenced was sentenced a few months ago by the Honorable

25   Reggie Walton in the District of Columbia -- and I provided the

1    name to the court reporter -- his name is Rodrigo Tovar Pupo,

2    a/k/a Jorge 40.

3            In terms of their membership and their participation

4    in the AUC, they are very, very similarly situated.  Both of

5    them were commanders.  Both of them were the guys that started

6    at the beginning in terms of ideological, in terms of wanting

7    to fight and fighting the Communist guerillas, as opposed to

8    some of these other commanders that came later who really were

9    commanders in name only, had never seen combat, never wanted to

10   see combat.  They were really narcotics traffickers that were

11   buying these fronts now from the AUC at the end stages of the

12   organization.  So Jorge 40, Mr. Tovar Pupo, and Mr. Veloza

13   Garcia were really guys that went in, in my client's case, as

14   you may recall, he went in as a private and rose through the

15   ranks.

16           Mr. Tovar Pupo, however, that's where the similarity

17   ends.  He did not cooperate with the United States government

18   at all.  In fact, he fought them tooth and nail.  He decried

19   the fact and argued forcefully and consistently that all he did

20   was collect war taxes, which is what he did, as well, and that

21   that was not a crime against the United States.  Clearly, I

22   disagree.  My client disagrees because he's testified down in

23   Colombia that when they were collecting drug taxes, they were

24   providing security for the narcotics traffickers and, as such,

25   they were contributing or furthering the aims of those

1   enterprises.  But Mr. Tovar Pupo did not take that position.

2   He said no, I should only be prosecuted in Colombia.

3        But, curiously enough, he was also kicked out of the

4   Justice and Peace process because the Justice and Peace process

5   requires you to be completely honest and up-front and cooperate

6   and he didn't want to do that either.  So he wanted to have his

7   cake and eat it too.  And so this is a defendant that was

8   kicked out of that process, which means now he's going to be

9   prosecuted under the regular justice system in Colombia as

10  opposed to this system that they've had.

11       Despite all of that and despite the fact that in every

12  other way criminally, same activity, same conduct, the

13  Honorable Reggie Walton did take into account that he was going

14  to be prosecuted in Colombia for those crimes that had to do

15  with his participation in the AUC and sentenced him to 16 years

16  in jail.  So I think that was very illustrative because, again,

17  he was the only other AUC commander that's been sentenced

18  outside of this district.  I listed all the other AUC

19  commanders and a few of them, obviously, one was four years,

20  another five years.  My client served already nine years day

21  for day.

22       There's only been one other AUC commander that was

23  sentenced in Washington.  His name is Salvatore Mancuso.  He

24  also was, I understand, kicked out of J and P; and the

25  government did not feel that his assistance was very

1    substantial.  He received a 15-year sentence.

2            So I think that's one of the reasons why the

3    government and I felt that we should at least provide him the

4    opportunity.  Obviously, this Court is going to make the final

5    call and the final decision.  But it seemed to us, anyway, that

6    it was appropriate or it seemed to me, I should say,

7    appropriate that this defendant be sentenced and be sentenced

8    to time served, particularly in light of some of these other

9    defendants who, again, provided much less cooperation, had

10   equal or higher violence, especially as it relates to this

11   country, when you kill a U.S. government or DEA confidential

12   informant, which he didn't do, and for that reason it was

13   appropriate.

14           THE COURT:  If I can just interrupt for a second.

15           With respect to the sentence that your client has

16   received in Colombia under the Justice and Peace initiative of,

17   if I'm recalling correctly, 84 months?

18           MR. OLIVA:  It's eight years.  It's a 40-year sentence

19   suspend down to eight.

20           THE COURT:  Eight years -- what will happen with

21   respect to that sentence?  If your client's asylum application

22   is granted here, I take it he will not return to Colombia to

23   serve that sentence, or is there some agreement between

24   Colombia and the United States concerning that?

25           MR. OLIVA:  There are other defendants who are

1   similarly situated, and in those cases the Colombian government

2   has not and will not ask for their extradition.  They're

3   perfectly happy because, in fact, they understand, and I'm

4   going to give you a point right now exactly on that, that them

5   being in Colombia is way more dangerous than being here.  Not

6   only that, there is some question and they have not made the

7   final decision.  The Justice and Peace process is very new, so

8   they're still constantly tweaking it in conjunction with the

9   United Nations and other organizations and NGOs that are

10  helping them out on this.  But there is some suggestion that

11  that would be concurrent with the sentence here because there

12  is some thought over there that the conduct really is

13  intertwined, both the conduct that happened here and the

14  conduct over there.  And, certainly, they want to recognize and

15  reward those individuals who have participated, as opposed to

16  those who haven't.

17          They have indicated that those who have been expelled

18  from Justice and Peace, that they are going to seek their

19  extradition.  So, for example, the gentleman I just mentioned,

20  there's a very high likelihood that he would in fact be

21  deported and extradited because not only that, he wouldn't even

22  have the opportunity to argue for CAT because he hasn't

23  cooperated against any political or military figure in

24  Colombia.

25          And in that regard, in fact, it's in the submission,

G67LGARS                          Sentence

there is a gentleman, an AUC commander, who also cooperated

much to his level in Colombia and received the eight years, but

he was only one block.  And he was released by the Colombians

despite the fact that he is indicted in this district, and

that's Diego Vecino, a/k/a Aleman, the German.  He was released

in Colombia, much to everybody's surprise, I might add, because

he's wanted here.  But perhaps he would have been better off

being brought here because two months after being released, and

he continued -- like he is -- continued cooperating, continued

participating in the Justice and Peace program.  There have

been two murder attempts already on him while he was out.  And

the third one didn't quite succeed, but left him in a coma from

which he has not recovered.  I'm talking about in the last

three months.

          So that only, again, highlights, No. 1, the risk of

danger that he has he incurred not only in his cooperation

against the United States' targets, but as well as the

Colombian targets.  But also it highlights why the government

of Colombia, when they have one of the few that has been really

the poster child -- he's been described that -- the poster

child for the Justice and Peace process in terms of the upper

echelons cooperating in a manner befitting of what it was

believed they wanted them to, it would be a devastating blow to

them and to the entire process for something to befall him.

          And speaking with the attorney here from Colombia,

1    Mr. Villota, Dr. Villota, they call him doctor in Colombia, he

2    has indicated to me that the Colombian prosecutors that he

3    works with and deals with in terms of Justice and Peace are

4    quite confident and expect that he would in fact remain here in

5    the United States.

6          So we fully expect that to happen.  It has already

7    happened as to two other individuals who, again, didn't even

8    participate in J and P, the two other defendants who I

9    mentioned earlier who were AUC members but really part of this

10   Anvigado office, which was really a murder for hire office that

11   contributed to the AUC.  Much like Mr. Veloza Garcia, all the

12   taxes that he would collect, most of those taxes would go to

13   the top leaders of the AUC.  What remained he would use to pay

14   salaries to his men who were in battle with the Communist

15   guerrillas.

16         And, again, unlike Mr. Pupo Tovar, who made much about

17   the fact that at the end of the day, I'm fighting with the

18   Colombian armed forces fighting the Communist guerrillas, this

19   is one of the few defendants who, again, in his effort to be

20   completely honest, said that's how it all started, but we were

21   corrupted.  By the end we were overrun by dopers.  We were

22   really at their employ and what we started doing, we didn't

23   finish doing.

24         And he, because of that, has actually been the target

25   of even more ire than some of the other participants because he

1    has a reputation for being brutally honest and part of that

2    honesty is saying let's not kid ourselves.  By the end of the

3    day, we weren't nearly as ideologically pure, any more than our

4    enemy was, which is very true.  The Communist guerrillas long

5    ago stopped caring about the peasants and the farmers and

6    distribution and really all they care is growing and producing

7    cocaine to send over here so they can stay in power.  God

8    willing, there will be a peace process.  And perhaps at this

9    point after 60 years of civil war in Colombia, we'll all get to

10   go to some of the nicer parts of Colombia that right now as

11   Americans we could not possibly go.

12         I'm going to conclude my comments.  I think I've

13   provided a very detailed presentation of the scope, the nature,

14   and the importance of the cooperation, and so has the

15   government.  And I compliment the government for having put

16   together that 5K submission.

17         As a summary, this is a defendant -- and I've been

18   doing this for 35 years.  I've represented over 400 cooperators

19   at all levels.  In fact, some of the people that are mentioned

20   in these submissions I represent.  And there is no question

21   that the cooperation, substantial assistance that this

22   defendant provided is among the highest.  And there's a reason

23   for that.  Because of the fact that he's a tax collector,

24   whereas other individuals that may come to this courthouse

25   belong to one organization or the other, they all came to him

1    to pay him taxes, very small taxes out of everything they were

2    doing.  But because of that, he was in an unenviable position

3    to really know a lot of these defendants.  And because of that,

4    the strategy that SDNY employed to extradite these particular

5    commanders was very smart and clever because the cooperation

6    he's been able to provide is something that really no other

7    narcotics trafficker in a pure sense could ever provide.

8            But, in sum, he's provided at my count cooperation and

9    procured the indictment of one, two, three, four, five, six

10   CPOTs.  And in the business when you talk about CPOT, that's

11   even above kingpin.  They are simply very few people that are

12   ever designated a CPOT.  And consolidated priority

13   organizational targets is the highest designation that OCDETF

14   puts on anybody.  This is the kind of label that's all hands on

15   deck.  Everybody in the government, every agency from DEA to

16   FBI to ICE to ATF to secret service is going to go after these

17   targets.  They're going to go after these targets.  These are

18   the worst of the worst.  These are the ones we know if we get

19   them and we put them away, it's going to make a dent in the

20   production and distribution and exportation of cocaine.

21           To have a defendant who cooperates against one CPOT is

22   phenomenal.  Two or three, you're in the stratosphere.  To have

23   a defendant that provided information that procured the

24   indictment of this many CPOTs is unheard of.  And I explained

25   to the Court why it's rare, in part.  But it is also incredibly

1    dangerous because you just made enemies out of incredibly large

2    organizations that continue.  You can cut the head off the

3    snake, but the organization continues.  It's vitally important.

4    Obviously, the fact he cooperated against his fellow AUC

5    commanders is important.

6            Finally, he cooperated against the generals in the

7    Colombian Army and the Colombian National Police that

8    cooperated, facilitated, aided and abetted and participated in

9    what he was doing.  And with the exception of one of them who

10   was extradited, none of them have been extradited.  They are

11   all being prosecuted by the Colombian government, as they

12   should be.  They're a sovereign nation and they should clean

13   their own laundry and they're doing that thanks to him.  Again,

14   this is really not your run-of-the-mill case and certainly not

15   the run-of-the-mill cooperation.

16           Just as a matter of housekeeping and one final matter,

17   there's a consent forfeiture agreement that you're going to

18   sign today.  He doesn't have any property in the United States.

19   But I wanted the Court to know that as part of his cooperation

20   with the Colombian government as part of the Justice and Peace

21   process, he did disgorge himself of everything he had.  It

22   wasn't even in his name.  They wouldn't have even known.  And

23   he provided and this is the Colombian documents.  And I already

24   killed enough trees with my sentencing memo.  I didn't want to

25   keep killing them.  And it's all in Spanish, so it was going to

1    cost me a bundle to translate it.

2           But, quite frankly, I can tell you and I would hope

3    that you would take my word for it, he delivered and gave back

4    to the Colombian government -- and this is not so much his own

5    property.  It was the property of the AUC that he controlled,

6    again, just like any other military commander, but it was eight

7    ranches, two vehicles, and then what he owned was ten pieces of

8    jewelry, seven or eight watches and a few of his gold chains,

9    gave it all in, disgorged himself of everything that he owned,

10   and helped the government identify what some of the other

11   commanders owned that he was aware of, which, again, is part of

12   the process.  You don't just give up what you have.  You got to

13   tell us what you know about the rest of the commanders, which,

14   of course, as a result of that, he is not going to win any

15   popularity contest.

16          And, if fact, that's one of the reasons why some of

17   these other guys have dropped out.  They would rather do the

18   time regardless of how long it is than give up their ill-gotten

19   gains.  And I know that's nothing new to this Court with other

20   defendants.  They're happy to give up people, but they won't

21   ever give up their own stuff.  But he certainly did and I did

22   want the Court to be aware of that, that this is not -- despite

23   the fact that the government here had a forfeiture and we

24   agreed to it, obviously, there's nothing here.  And under the

25   agreement that we have with Colombia, they're not able to

1    forfeit anything in Colombia and bring it back here.  That's

2    one of the conditions for extradition that they have.  They

3    keep -- they get to keep all the goods and it makes sense to

4    me.

5           So, your Honor, I'm open to any questions you may

6    have.  I did not want to take the time of the Court rehashing

7    everything that I already told you in my sentencing submission,

8    but I did want to just note to the Court his past and continued

9    cooperation in J and P that has been nothing short of

10   remarkable and through that, the cooperation that he's provided

11   that's been very extensive.  And, obviously, just note in

12   passing the importance and the amount of cooperation that

13   really drove us to want to come before you and give you the

14   opportunity to decide whether or not enough is enough, and I

15   hope you do, and to then also provide you what some other

16   courts have sentenced similarly situated defendants in terms of

17   level, but certainly not in terms of their cooperation both

18   with the United States and with the government of Colombia.

19          And, finally, just also again, almost in beating a

20   dead horse, but both of our submissions were abundantly clear

21   that in other cases risk of danger is something we talk about,

22   it's speculative.  It's theoretical or hypothetical, rather.

23   Not the case here.  There have been actual murder attempts on

24   his family.  There have been actual murders of individuals that

25   he procured their cooperation, his own men, which when he

1    demobilized, he told them, his last order as commander was you

2    will participate in Justice and Peace, you will tell the truth.

3    And some of those paid, who remained in Colombia, paid for

4    that, obeying that order with their own lives and the lives of

5    their families.  We have the wife of one of his men was killed.

6    And those threats continue to exist and as highlighted by one

7    of his old associates being put in a coma a few months ago.

8            And, finally, I just wanted Court to be aware that he

9    has not and is not walking out of this a rich man.  Far from

10   it.  He's given everything up.

11           And so for all of those reasons, your Honor, I would

12   again respectfully ask that you sentence this defendant to time

13   served, which is in effect a ten-year sentence, and I think

14   that certainly will meet all of the factors not only under

15   5K1.1, but, quite frankly, all of the factors under 3553(e).

16   Nobody looking at this defendant is going to feel that there

17   hasn't been a signal of deterrence.  He's going to continue

18   paying the price, and he will continue cooperating with both

19   governments.

20           So I thank you for your patience and your time.

21           THE COURT:  All right.  Thank you, Mr. Oliva.  Your

22   responses to my questions were very informative.

23           Ms. Surratt, does the government wish to be heard

24   further?

25           MS. SURRATT:  Very briefly, your Honor.

1         First, as a matter of administrative matters, as

2    Mr. Oliva mentioned, we are going to ask the Court to enter the

3    order of forfeiture that has been prepared and that all the

4    parties will sign.  It's in the amount of $2.5 million and

5    that's on consent.

6         The second administrative matter, this morning I sent

7    over to your Honor's chambers the plea transcript from 2010

8    along with a plea acceptance letter.  I believe that the U.S.

9    Attorney's Office did send this over in 2000, but I wasn't here

10   and neither were your clerks and we couldn't figure out if it

11   had been signed.  So we passed it up again and I just wanted to

12   make sure the Court had seen it.

13        THE COURT:  I have seen it and read it today.  Yes.

14        MS. SURRATT:  Thank you, your Honor.  And my apologies

15   for doing this at the last minute, and thank you to your clerks

16   for noticing this.

17        So, your Honor, I don't have a lot to add beyond what

18   is in the 5K and beyond what Mr. Oliva just said.  Like I said

19   earlier, the government's view is this is an extraordinary

20   defendant in all senses of the word.  The first half of my 5K

21   submission is spent detailing what can only be described as

22   pretty horrific offense conduct.  Like Mr. Oliva said, the

23   defendant was an AUC commander.  And while he wasn't, in

24   Mr. Oliva's words, a pure narcotics trafficker, he was

25   intimately involved in the narcotics trade through his role as

1    an AUC commander.

2              In that capacity, he participated in thousands of

3    murders, either by his own hand or by ordering people to do it

4    or by getting people killed in connection with AUC military

5    operations.  So there's no question that the offense conduct

6    here was extremely serious, some of the most serious that this

7    Court has probably ever seen.

8              On the other hand, his cooperation was similarly

9    extraordinary.  Mr. Oliva mentioned in his submission and I did

10   too in my 5K letter that the defendant began cooperating

11   immediately upon his arrest in Colombia, first meeting with law

12   enforcement authorities and then shortly thereafter with his

13   counsel meeting with the U.S. prosecutors, not me, but an AUSA

14   from ten years ago.  It has been the experience with every USA

15   who has met with this defendant and, frankly, every law

16   enforcement officer, every Colombian official, and every member

17   of the U.S. government, that he has been candid and truthful

18   and helpful, really to an extent unseen in many cooperators.

19   The level of immediate truthfulness and candidness was really

20   extraordinary.  And I know this from speaking with people who

21   were around at the time.  Again, this wasn't me.  Like

22   Mr. Oliva outlined, the level of detail and the level of

23   importance of the information that this defendant provided was

24   extraordinary.

25             So when your Honor asked at the outset whether it was

1    the government's position that time served is the appropriate

2    sentence, the government still won't take a position other than

3    to say the government believes this is a hard question.  It's a

4    hard sentencing given both of the equities in this case.

5             And beyond that, your Honor, I'm happy to answer any

6    questions.  Otherwise, the government rests on its submission.

7             THE COURT:  All right.  I really don't have any

8    further questions for you.  I think that several of the

9    concerns that I have expressed have really been addressed in

10   counsel's remarks.  Obviously, this Court has never seen this

11   defendant until today and, therefore, I can only rely on the

12   submissions until I get to the sentencing proceeding.

13            It is a very difficult sentencing.  And my initial

14   most serious concern about the imminence of an extradition has

15   really been I think adequately addressed by defense counsel and

16   I'm prepared to proceed with sentencing.

17            But, first, would the defendant like to address the

18   Court?

19            THE DEFENDANT:  Yes, your Honor.

20            THE COURT:  I'll hear from him now.  The defendant can

21   stand and just be close to the interpreter.

22            THE DEFENDANT:  Your Honor, I would respectfully want

23   to express to you that I am completely sorry for having

24   participated in a war that was not something that I came up

25   with, but that I participated in.  But as a result of the

circumstances that exist in my country and that existed with me

led me to be involved in it.  I was convinced that I was

fighting for my country, that I was fighting Communist

guerrillas, Communists that wanted to take over my country.

But, unfortunately, during that fight, we became involved with

a segment of the chain, of the drug trafficking chain.  In

order to finance the war against the Communist guerrillas, the

FARC, that is why in 2004 I became -- it became clear to me

that that was not the fight that was proper.  That is why

starting in 2004, I realized that that was not the proper fight

for my country.

        I surrendered to the Colombian government and

immediately the U.S. government got in touch with me.  I

started to cooperate in order to fight against drug

trafficking.  That is the real fuel that is added to the war.

That is why I have made the commitment, first of all, with

myself to be committed a hundred percent with American and

Colombian justice.  As a result of the sacrifices that my

family has had to endure, the danger that I have put them in,

and they have had to participate in witness protection programs

because during this process, I have had to reveal the

participation of the Colombian government, of businessmen, of

politicians, and many of the generals were part of the highest

ranking members of law enforcement in my country.

        But I am not sorry for having helped law enforcement,

1    and if I have to continue helping law enforcement, I will

2    continue to do so for the sake of my country, Colombia.

3    Because drug trafficking only leads our countries down the path

4    of poverty and violence.  I am truly regretful of having

5    participated in those violent activities, and I am committed to

6    never again participating in any activity that is violent

7    against other human beings or anyone who is around me.

8         I ask my family's forgiveness for the sacrifices that

9    they have had to endure for what I did, and I promise that I

10   will never let them down again.  I will not let them down nor

11   will I let down law enforcement.

12        Thank you very much, your Honor.

13        THE COURT:  The defendant, Herbert Veloza Garcia,

14   comes before this Court having pled guilty to two very serious

15   crimes against the United States, conspiracy to import cocaine

16   and the distribution of cocaine.

17        This Court has reviewed the presentence investigation

18   report.  I adopt the findings of fact in that report as my own

19   and will cause the report to be docketed and filed under seal

20   as part of the record in this case.

21        Mr. Veloza Garcia is responsible for trafficking more

22   than 450 kilograms of cocaine, a very significant amount of

23   cocaine which the guidelines recognize with a base offense

24   level of 43.  Because the defendant was a leader of the AUC and

25   commanded numerous individuals and an organizer of the criminal

G67LGARS                      Sentence

1   activity here that involved five or more participants and was

2   extensive, a four-level role adjustment is appropriate.

3           Now, the defendant accepted responsibility for his

4   criminal conduct in a plea before Magistrate Judge Cott.  I

5   have reviewed the minutes of that proceeding.  I find that the

6   defendant's plea was knowing and voluntary and that he's

7   accepted responsibility and, accordingly, I grant him a

8   three-level reduction in the guidelines.

9           And so his total offense level is 43.  This is his

10  first criminal conviction in the United States.  Under the

11  guidelines, that yields a guideline range of life in prison on

12  each count.

13          Now, the government moves here for a downward

14  departure.  This Court has reviewed the government's

15  submission, understanding it somewhat better now after the

16  sentencing proceeding has moved to this point.  I grant the

17  government's application for a downward departure for

18  substantial assistance.

19          And so the question for this Court is what sentence is

20  the appropriate sentence for this defendant.

21          As recounted in the extensive submissions both by the

22  government and defense counsel, the defendant became involved

23  with the AUC, a military organization in Colombia.  Over time,

24  whatever ideological principles the AUC thought it was fighting

25  for were certainly corrupted by narcotics traffickers, and the

G67LGARS                        Sentence

1   AUC and this defendant became willing accomplices in the global

2   supply chain of cocaine from Colombia.  The events recited in

3   both submissions of the defendant's conduct in Colombia are

4   appalling.  The defendant acknowledges being responsible for

5   the deaths of thousands of people and various scenes are

6   recounted as vignettes in the submissions.  The violence was

7   wanton and unchecked.

8           In the search to root out FARC guerrillas or others

9   who would undermine AUC and its tax collection efforts and its

10  drug trade, the defendant and others under his control would do

11  such things as go to a village disco at night intent on killing

12  two or three people who they believed were guerrillas working

13  against them and perhaps not even finding those people in the

14  disco but nevertheless opening fire and killing 20 or more

15  innocent people who were just out for a night at a disco.

16          The defendant must have truly been a terror to meet at

17  that time.  And God help anyone who the defendant thought was a

18  threat to him or his organization.

19          Now, at the same time, this Court acknowledges that

20  the defendant ultimately surrendered to Colombian authorities

21  and has become an extremely valuable asset not only to the

22  government of Colombia, but to the United States.  He's placed

23  his family and all of his relatives in very grave danger.  As a

24  consequence of his acts, he's been separated from his family

25  for a very long time during his term of incarceration here.

G67LGARS                          Sentence

1          The government speaks in profound terms about his

2     cooperation in interrupting Colombian drug trafficking.  And

3     the defendant appears to this Court to express genuine remorse

4     for his many year reign of terror.  These were acts of war

5     against a civilian population completely unchecked.

6          This Court is mindful that the Colombian government

7     finds the defendant to be essentially its poster child for the

8     Justice and Peace program, that he will continue to work in

9     that regard, that it's likely that any sentence imposed now by

10    Colombia will be deemed to be served concurrently with any

11    sentence imposed by this Court.

12         And so in trying to fashion a sentence, I'm trying to

13    take into consideration the gravity of the crimes here, the

14    duration, the defendant's role in them, and at the same time

15    his efforts to do something that no human being can do, turn

16    back the clock of time.  He can't do that.  But he can endeavor

17    to atone by cooperating fully with government authorities.

18         And so it's against that backdrop, Mr. Veloza Garcia,

19    that I'm prepared to impose sentence on you and I'd ask, sir,

20    that you stand.

21         Mr. Veloza Garcia, someone today or perhaps both

22    attorneys said this is not a run-of-the-mill case and it

23    certainly is not a run-of-the-mill case.  In my 18 years on the

24    bench, I can't say that I've had a case that approaches this

25    case as I read through all of the submissions, both by your

1    counsel and, quite frankly, the longest 5K letter I think I've

2    ever received.  But I have to balance the severity of your

3    crimes with the work that you've done and continue to do for

4    the government.

5              And so it's against that backdrop that it's my

6    judgment that you be sentenced to a term of 132 months of

7    imprisonment, to be followed by a term of supervised release

8    subject to all of the standard conditions of supervised release

9    that I'm going to review with you in a moment and that the

10   government proposed in their letters, specifically that you

11   cooperate fully with the United States Attorney's Office for

12   the Southern District of New York, the Drug Enforcement

13   Administration, and any other law enforcement agency designated

14   by the United States Attorney's Office, that you attend all

15   meetings at which the United States Attorney's Office requests

16   your presence, that you truthfully and completely disclose all

17   information with respect to your activities concerning all

18   matters about which the United States Attorney's Office

19   inquires, and that you provide the United States Attorney's

20   Office upon request any document, record, or other tangible

21   evidence relating to matters about which the United States

22   Attorney's Office or any designated law enforcement agency

23   inquires of you, and that you truthfully testify before the

24   grand jury or at any trial or other court proceeding with

25   respect to any matters about which United States Attorney's

1    Office may request your presence.

2               The term of supervised release is going to be seven

3    years of supervised release.  And I'm going to impose, of

4    course, all of the standard conditions of supervised release as

5    I do with every defendant and that will include periodic and

6    random drug testing.

7               I am not going to impose any fine on you because

8    you're agreeing to an order of forfeiture here today and any

9    fine would be an exercise in futility.

10              I am imposing a mandatory $200 special assessment.

11              And I will sign the order of forfeiture.

12              Now, this, Mr. Veloza Garcia, constitutes the sentence

13   of this Court.  I advise you that to the extent you have not

14   previously waived your right to appeal, you have the right to

15   appeal.  I advise you further that if you cannot afford

16   counsel, counsel will be provided to you free of cost.

17   Mr. Oliva has done a remarkable and outstanding job for you in

18   his sentencing submission to the Court and his remarks here

19   today, and I am confident that he will advise you further with

20   respect to your appeal rights.

21              You may be seated.

22              Are there any further applications?

23              MS. SURRATT:  One moment, please, your Honor.

24              Not from the government, your Honor.  Thank you.

25              THE COURT:  Anything further, counsel?

1           MS. SURRATT:  Your Honor, the government does move to

2  dismiss the underlying indictment since the defendant pled

3  guilty to the S1 indictment.

4           THE COURT:  The government's application is granted.

5           MR. OLIVA:  Your Honor, the reason I'm conferring with

6  counsel is because although he's not going to -- I expect based

7  on what I know of his sentence, it's probably going to be

8  another eight months before he gets released, give or take.

9  But he's still participating in the Justice and Peace process

10  and the Bureau of Prisons doesn't always understand that

11  because I've had that happen with other paramilitary defendants

12  that are involved in Justice and Peace, which is the process

13  that really is accounting for much of what the Court has

14  indicated today, as well, and I would just add that.

15           But for that reason, I would suggest either that in

16  your judgment and commitment order you include a

17  recommendation -- Bureau of Prisons, you know, will do what

18  they will do, but a recommendation from the Court in light of

19  the necessary participation in Justice and Peace that he be

20  designated either in -- I think the best institution right now

21  where they have video conference facilities and where they've

22  designated the other ones would be Miami FDC.  The Federal

23  Detention Center in Miami is I think the one place where

24  they're doing that.

25           THE COURT:  Just to be clear, what's the precise name

1    of the institution?

2              MR. OLIVA:  Thank you, your Honor.  Miami Federal

3    Detention Center.

4              THE COURT:  Okay.

5              MR. OLIVA:  Miami FDC.

6              THE COURT:  I will grant that and include it as a

7    recommendation.

8              MR. OLIVA:  Thank you very much.

9              The other matter is, and this has also been done in

10   the other AUC cases and I think the government probably even

11   alluded to it in their submission, it's important that it's

12   also noted in the judgment and commitment order that he should

13   get credit for the time served from the moment that the

14   indictment was served upon him.

15             MS. SURRATT:  Yes.  The government certainly doesn't

16   object to the defendant getting credit for the time he spent in

17   Colombia.

18             THE COURT:  I will indicate that as well.

19             MS. SURRATT:  I actually spoke to the Bureau of

20   Prisons about this very issue this week, your Honor, in

21   anticipation of this sentencing and many others that I have.

22   It's my understanding that it certainly helps to have your

23   Honor note that and I'll confer with Mr. Oliva about that.  But

24   I think BOP will want some sort of proof from us, from the

25   parties, about the amount of time he spent in Colombia; and

1   Mr. Oliva and I will certainly take care of that.

2            THE COURT:  I would ask that you make in the next day

3   or so a short letter submission to me containing the precise

4   language that you would like me to use in the judgment of

5   conviction that would also contain the date from the time of

6   his incarceration in Colombia.

7            MS. SURRATT:  We will certainly do that, your Honor.

8   We will also make sure the BOP gets the documentation that they

9   need to support that language.

10           MR. OLIVA:  Perfect.  Thank you, your Honor.

11           THE COURT:  Anything further?

12           MR. OLIVA:  No, your Honor.  We thank the Court for

13   the Court's time.

14           THE COURT:  All right.  Mr. Veloza Garcia, I will only

15   say to you, sir, in conclusion of this proceeding, that it is

16   only because of your extraordinary cooperation that

17   notwithstanding all of the horrendous things that you've done

18   in the course of your life that you are going to get the chance

19   soon to hit the restart button.  And I trust that your attorney

20   will proceed promptly with the appropriate application to the

21   United States government with respect to your status.

22           And I trust, sir, that I will not see you again for

23   any violation of supervised release because you've been given

24   an enormous break here in this case.

25           Do you understand, sir?

G67LGARS                    Sentence

1            THE DEFENDANT:  Yes, your Honor.

2            THE COURT:  All right.  Good luck.

3                              oOo